**REDACTED**

## UNITED STATES DISTRICT COURT
## EASTERN DISTRICT OF MICHIGAN
## SOUTHERN DIVISION

_____

In Re:  AUTOMOTIVE PARTS
ANTITRUST LITIGATION
_____

In re:  AUTOMATIC TRANSMISSION FLUID
WARMERS
_____

THIS RELATES TO:

ALL AUTOMOBILE DEALER ACTIONS
_____

)
)
)    12-md-02311
)    Honorable Marianne O. Battani
)
)    2:13-cv-02402-MOB-MKM
)
)
)
)    CONSOLIDATED AMENDED
)    CLASS ACTION COMPLAINT
)
)    JURY TRIAL DEMANDED
)
)    **[FILED UNDER SEAL-HIGHLY
)    CONFIDENTIAL]**
)

REDACTED

Plaintiffs Martens Cars of Washington, Inc. ("Plaintiff Martens"); Landers Auto Group No. 1, Inc., d/b/a Landers Toyota ("Plaintiff Landers"); Hammett Motor Company, Inc. ("Plaintiff Hammett"); Superstore Automotive, Inc. ("Plaintiff Superstore"); Lee Pontiac-Oldsmobile-GMC Truck, Inc. ("Plaintiff Lee"); Westfield Dodge City, Inc. ("Plaintiff Westfield"); V.I.P. Motor Cars Ltd. ("Plaintiff V.I.P."); Green Team of Clay Center Inc. ("Plaintiff Green Team"); McGrath Automotive Group, Inc. ("Plaintiff McGrath "); Table Rock Automotive, Inc., d/b/a Todd Archer Hyundai ("Plaintiff Table Rock"); Archer-Perdue, Inc., d/b/a/ Archer-Perdue Suzuki ("Plaintiff Archer-Perdue"); Bonneville and Son, Inc. ("Plaintiff Bonneville"); Pitre, Inc., d/b/a/ Pitre Buick GMC ("Plaintiff Pitre"); Patsy Lou Chevrolet, Inc. ("Plaintiff Patsy Lou");  John Greene Chrysler Dodge Jeep, LLC ("Plaintiff John Greene"); Herb Hallman Chevrolet, Inc., d/b/a/ Champion Chevrolet ("Plaintiff Champion"); Charles Daher's Commonwealth Motors, Inc., d/b/a Commonwealth Chevrolet, Commonwealth Kia, Commonwealth Honda ("Plaintiff Commonwealth Motors"); Commonwealth Volkswagen, Inc., d/b/a Commonwealth Volkswagen ("Plaintiff Commonwealth Volkswagen"); Commonwealth Nissan, Inc., d/b/a Commonwealth Nissan ("Plaintiff Commonwealth Nissan"); Ramey Motors, Inc. ("Plaintiff Ramey"); Thornhill Superstore, Inc., d/b/a Thornhill GM Superstore ("Plaintiff Thornhill"); Dave Heather Corporation, d/b/a Lakeland Toyota Honda Mazda Subaru ("Plaintiff Lakeland"); Central Salt Lake Valley GMC Enterprises, LLC, d/b/a Salt Lake Valley Buick GMC ("Plaintiff Salt Lake Valley"); Capitol Chevrolet Cadillac, Inc. ("Plaintiff Capitol Chevrolet"); Capitol Dealerships, Inc., d/b/a Capitol Toyota ("Plaintiff Capitol Toyota "); Stranger Investments d/b/a Stephen Wade Toyota ("Plaintiff Wade"); John O'Neil Johnson Toyota, LLC ("Plaintiff Johnson"); Hartley Buick GMC Truck, Inc. ("Plaintiff Hartley"); Lee Oldsmobile-Cadillac, Inc. d/b/a Lee Honda ("Plaintiff Lee Honda"); Lee Auto Malls-Topsham,

1

REDACTED

Inc. d/b/a Lee Toyota of Topsham ("Plaintiff Topsham"); Cannon Nissan of Jackson, LLC ("Plaintiff Cannon Nissan"); Shearer Automotive Enterprises III, Inc. ("Plaintiff Shearer"); Empire Nissan of Santa Rosa, LLC ("Plaintiff Empire Nissan"); Hodges Imported Cars, Inc. d/b/a Hodges Subaru ("Plaintiff Hodges"); Ancona Enterprise, Inc. d/b/a Frank Ancona Honda ("Plaintiff Ancona"); Bill Pearce Motors d/b/a Bill Pearce Courtesy Honda ("Plaintiff Pearce"); HC Acquisition, LLC d/b/a Toyota of Bristol ("Plaintiff Bristol"); and Apex Motor Corporation ("Plaintiff Apex") ("Plaintiffs"), on behalf of themselves and all others similarly situated (the "Classes" as defined below), upon personal knowledge as to the facts pertaining to themselves and upon information and belief as to all other matters, and based on the investigation of counsel, bring this class action for damages, injunctive relief, and other relief pursuant to federal antitrust laws and state antitrust, unfair competition, consumer protection, and unjust enrichment laws, and allege as follows:

## NATURE OF ACTION

1.      This lawsuit is brought as a proposed class action against DENSO Corporation, DENSO International America, Inc. (together, "DENSO" or the "DENSO Defendants"), T.RAD Co., Ltd. ("T.RAD"), Calsonic Kansei Corporation and Calsonic Kansei North America, Inc. (together, "Calsonic" or the "Calsonic Defendants") (collectively, "Defendants") and unnamed co-conspirators, manufacturers and/or suppliers of automatic transmission fluid warmers ("ATF Warmers") (defined below) and Oil Coolers (defined below) globally and in the United States, for engaging in a long-running conspiracy to unlawfully fix, artificially raise, maintain and/or stabilize prices, rig bids for, and allocate the market and customers in the United States for ATF Warmers and Oil Coolers.  According to the United States Department of Justice ("DOJ"), Defendants' conspiracy successfully targeted the long-struggling United States automotive industry, raising prices for car manufacturers and consumers alike.

REDACTED

2.      Plaintiffs seek to represent all automobile dealers, during the period from and including November 1, 2002 through the present (the "Class Period"), purchased[1] vehicles which included one or more ATF Warmers or Oil Coolers as a component part, or purchased one or more ATF Warmers or Oil Coolers as a replacement part, which were manufactured or sold by Defendant, any current or former subsidiary of Defendant or any co-conspirator of Defendant.

3.      "ATF Warmers" are devices located in the engine compartment of a vehicle that warm the automatic transmission fluid.  An ATF Warmer helps improve fuel efficiency reducing friction in the vehicle's transmission.

4.      "Oil Coolers" are devices located in the engine compartment of a vehicle that remove surplus heat from the engine oil.

5.      Defendants manufacture, market, and/or sell ATF Warmers and Oil Coolers throughout and into the United States. Defendants, and their co-conspirators (as yet unknown), agreed, combined, and conspired to fix, raise, maintain and/or stabilize prices, rig bids and allocate the market and customers in the United States for ATF Warmers and Oil Coolers.

6.      The DOJ's Antitrust Division is currently conducting a broad criminal investigation into illegal price-fixing and bid-rigging in the automotive parts industry.  As part of its criminal investigation, the DOJ is seeking information about unlawful anticompetitive conduct in the market for a number of different but related automotive parts, and the Federal Bureau of Investigation ("FBI") has participated in raids, pursuant to search warrants, carried out

_____

[1] "Vehicles" as used here, means any new vehicles purchased by automobile dealers throughout the United States, including but not limited to sedans, trucks and sport utility vehicles.

**REDACTED**

in the offices of a number of major competitors in the automotive parts industry. The automotive parts investigation is the largest criminal investigation the Antitrust Division has ever pursued, both in terms of its scope and its impact on American consumers and businesses. The ongoing cartel investigation of price-fixing and bid-rigging in the automotive parts industry has yielded more than $2.5 billion in criminal fines.

7.      Defendant DENSO Corporation agreed to plead guilty to a two-count criminal Information and to pay a $78 million fine for participating in a combination and conspiracy to suppress and eliminate competition in the automotive parts industry by agreeing to rig bids for, and to fix, stabilize, and maintain the prices of, certain electronic control units ("ECUs") and heater control panels ("HCPs") sold to an automobile manufacturer in the United States and elsewhere from at least as early as January 2000 until at least February 2010. The combination and conspiracy engaged in by Defendant DENSO Corporation and its co-conspirators was an unreasonable restraint of interstate and foreign trade and commerce in violation of the Sherman Antitrust Act, 15 U.S.C. § 1.

8.      In addition to the fact that Defendant DENSO Corporation pleaded guilty and agreed on its own behalf and on behalf of its subsidiaries to cooperating in the government's investigation, several of its high-ranking executives have pleaded guilty to criminal price-fixing in the automotive parts industry.

9.      On March 26, 2012, the DOJ announced that Norihiro Imai, an executive of Defendant DENSO Corporation, agreed to serve one year and one day in a U.S. prison, pay a $20,000 criminal fine, and plead guilty to a one-count criminal Information charging him with engaging in a conspiracy to rig bids for, and to fix, stabilize and maintain the prices of HCPs sold to customers in the United States and elsewhere.

REDACTED

10.    On April 26, 2012, the DOJ announced that Makoto Hattori, an executive of Defendant DENSO Corporation, agreed to serve fourteen months in a U.S. prison, pay a $20,000 criminal fine, and plead guilty to a one-count criminal Information charging him with engaging in a conspiracy to rig bids for, and to fix, stabilize, and maintain the prices of HCPs sold to a customer in the United States and elsewhere.

11.    On May 21, 2013, the DOJ announced that Yuji Suzuki, an executive of Defendant DENSO Corporation, agreed to serve sixteen months in a U.S. prison, pay a $20,000 criminal fine, and plead guilty to a two-count criminal Information for his role in a conspiracy to rig bids for, and to fix, stabilize, and maintain the prices of ECUs and HCPs sold in the United States and elsewhere. Also on May 21, 2013, the DOJ announced that Hiroshi Watanabe, an executive of Defendant DENSO Corporation, agreed to serve fifteen months in a U.S. prison, pay a $20,000 criminal fine, and plead guilty to a one-count criminal Information for his role in a conspiracy to rig bids for, and to fix, stabilize, and maintain the prices of HCPs sold in the United States and elsewhere.

12.    On February 20, 2014, the DOJ announced that Kazuaki Fujitani, a former executive of Defendant DENSO Corporation, agreed to serve one year and one day in a U.S. prison and plead guilty to a one-count criminal Information charging him with obstruction of justice for deleting numerous e-mails and electronic documents upon learning the FBI was executing a search warrant on Defendant DENSO International America, Inc. in connection with the DOJ's investigation into a conspiracy to fix the prices of HCPs installed in automobiles sold in the United States and elsewhere.

13.    On June 30, 2014, the DOJ announced that Satoru Horisaki, a former executive of Defendant DENSO Corporation, agreed to serve one year and one day in a U.S. prison, pay a

5

**REDACTED**

$20,000 criminal fine, and plead guilty to a one-count criminal Information charging him with participating in a conspiracy to agree upon bids and prices for, and allocate the supply of, automotive instrument panel clusters sold to Honda of America Manufacturing Co. Inc., in the United States and elsewhere.

14.     On September 26, 2013, the DOJ announced that Defendant T.RAD Co., Ltd. agreed to plead guilty to a one-count criminal Information and to pay a $13.75 million fine for participating in a combination and conspiracy to suppress and eliminate competition in the automotive parts industry by agreeing to rig bids for, and to fix, stabilize, and maintain the prices of, radiators sold to Toyota Motor Corporation and Honda Motor Company Ltd. and ATF Warmers sold to Toyota Motor Corporation, in the United States and elsewhere, from at least as early as November 2002 until at least February 2010, in violation of the Sherman Antitrust Act, 15 U.S.C. § 1.

15.     In addition to the fact that Defendant T.RAD Co., Ltd. pleaded guilty and agreed to cooperate in the government's investigation, two of its highly ranked executives have pleaded guilty to criminal price-fixing in the automotive parts industry.

16.     On December 9, 2014, the DOJ announced that Kosei Tamura, a former executive of Defendant T.RAD Co., Ltd., agreed to serve one year and one day in a U.S. prison, pay a $20,000 criminal fine, and plead guilty to a one-count criminal Information charging him with participating in a conspiracy to agree upon bids and prices for, and allocate the supply of, radiators sold to Honda Motor Co., Inc. and its subsidiaries in the United States and elsewhere.

17.     On May 14, 2015, the DOJ announced that a grand jury returned a one-count criminal indictment against Michitaka Sakuma, a former director and member of the board of directors of Defendant T.RAD Co., Ltd., for his participation in a conspiracy to agree upon bids

REDACTED

and prices for, and allocate the supply of, radiators sold to Honda Motor Company, Ltd. and Toyota Motor Corporation, and certain of their subsidiaries, in the United States and elsewhere.

18.     As a direct result of the anticompetitive and unlawful conduct alleged herein, Plaintiffs and the Classes (as defined below) paid artificially inflated prices for ATF Warmers and Oil Coolers during the Class Period and have thereby suffered antitrust injury to their business or property.

## JURISDICTION AND VENUE

19.     Plaintiffs bring this action under Section 16 of the Clayton Act (15 U.S.C. § 26) to secure equitable and injunctive relief against Defendants for violating Section 1 of the Sherman Act (15 U.S.C. § 1). Plaintiffs also assert claims for actual and exemplary damages pursuant to state antitrust, unfair competition, consumer protection and unjust enrichment laws, and seek to obtain restitution, recover damages and secure other relief against the Defendants for violations of those state laws. Plaintiffs and the Classes also seek attorneys' fees, costs, and other expenses under federal and state law.

20.     This Court has jurisdiction over the subject matter of this action pursuant to Section 16 of the Clayton Act (15 U.S.C. § 26), Section 1 of the Sherman Act (15 U.S.C. § 1), and Title 28, United States Code, Sections 1331 and 1337. This Court has subject matter jurisdiction of the state law claims pursuant to 28 U.S.C. §§ 1332(d) and 1367, in that: (1) this is a class action in which the matter or controversy exceeds the sum of $5,000,000, exclusive of interest and costs, and in which some members of the proposed Classes are citizens of a state different from the Defendants, and (ii) Plaintiffs' state law claims form part of the same case or controversy as their federal claims under Article III of the United States Constitution.

21.     Venue is proper in this District pursuant to Section 12 of the Clayton Act (15 U.S.C. § 22), and 28 U.S.C. §§ 1391 (b), (c), and (d), because a substantial part of the events

**REDACTED**

giving rise to Plaintiffs' claims occurred in this District, a substantial portion of the affected interstate trade and commerce discussed below has been carried out in this District, and one or more of the Defendants reside, are licensed to do business in, are doing business in, had agents in, or are found or transact business in this District.

22.     This Court has *in personam* jurisdiction over the Defendants because each, either directly or through the ownership and/or control of their subsidiaries, *inter alia*: (a) transacted business in the United States, including in this District; (b) directly or indirectly sold or marketed substantial quantities of ATF Warmers and Oil Coolers throughout the United States, including in this District; (c) had substantial aggregate contacts with the United States, including in this District; or (d) were engaged in an illegal price-fixing conspiracy that was directed at, and had a direct, substantial, reasonably foreseeable and intended effect of causing injury to, the business or property of persons and entities residing in, located in, or doing business throughout the United States, including in this District.  Defendants also conduct business throughout the United States, including in this District, and have purposefully availed themselves of the laws of the United States.

23.     Defendants engaged in conduct both inside and outside of the United States that caused direct, substantial and reasonably foreseeable and intended anticompetitive effects upon interstate commerce within the United States.

24.     The activities of the Defendants and their co-conspirators directly targeted the United States ATF Warmers and Oil Coolers market and were within the flow of, were intended to, and did have, a substantial effect on interstate commerce of the United States.

25.     ATF Warmers and Oil Coolers manufactured abroad by the Defendants and sold for use in vehicles in the United States are goods brought into the United States for sale, and

**REDACTED**

therefore constitute import commerce.  To the extent any ATF Warmers and Oil Coolers are purchased in the United States, and such ATF Warmers and Oil Coolers do not constitute import commerce, Defendants' activities with respect thereto, as more fully alleged herein during the Class Period, had, and continue to have, a direct, substantial and reasonably foreseeable effect on United States commerce. The anticompetitive conduct, and its effect on United States commerce described herein, proximately caused antitrust injury to Plaintiffs and members of the Classes in the United States.

26.     By reason of the unlawful activities hereinafter alleged, Defendants' unlawful activities substantially affected commerce throughout the United States, causing injury to Plaintiffs and members of the Classes. Defendants, directly and through their agents, engaged in activities affecting all states, to fix, raise, maintain and/or stabilize prices, rig bids and allocate the market and customers in the United States for ATF Warmers and Oil Coolers, which conspiracy unreasonably restrained trade and adversely affected the market for ATF Warmers and Oil Coolers.

27.     Defendants' conspiracy and wrongdoing described herein adversely affected persons in the United States who purchased or leased a new vehicle in the United States not for resale which included one or more ATF Warmers and Oil Coolers.

## PARTIES

### Plaintiffs

28.     Plaintiff Martens is a Maryland corporation that had its principal place of business in the District of Columbia during the Class Period.  During the Class Period Plaintiff Martens was an authorized Volvo and Volkswagen dealer who sold Volvo- and Volkswagen-brand vehicles containing ATF Warmers and Oil Coolers manufactured by one or more of the

9

**REDACTED**

Defendants or their co-conspirators, as well as ATF Warmers and Oil Coolers manufactured by one or more of the Defendants or their co-conspirators.

29.     During the Class Period, Plaintiff Martens purchased vehicles containing ATF Warmers and Oil Coolers manufactured by one or more of the Defendants or co-conspirators. Plaintiff Martens also purchased ATF Warmers and Oil Coolers, manufactured by one or more of the Defendants or their co-conspirators, for its repair and service business, during the Class Period.  Plaintiff Martens purchased and received both these vehicles and ATF Warmers and Oil Coolers in the District of Columbia.  Plaintiff Martens has also displayed, sold, and advertised its vehicles in the District of Columbia during the Class Period.

30.     Plaintiff Landers is an Arkansas corporation with its principal place of business in Little Rock, Arkansas.  Plaintiff Landers is an authorized Toyota dealer who bought Toyota-brand vehicles containing ATF Warmers and Oil Coolers manufactured by one or more of the Defendants or their co-conspirators, as well as ATF Warmers and Oil Coolers manufactured by one or more of the Defendants or their co-conspirators, during the Class Period.

31.     During the Class Period, Plaintiff Landers purchased vehicles containing ATF Warmers and Oil Coolers manufactured by one or more Defendants or their co-conspirators. Plaintiff Landers also purchased ATF Warmers and Oil Coolers, manufactured by one or more Defendants or their co-conspirators, for its repair and service business, during the Class Period. Plaintiff Landers purchased and received both the afore-mentioned vehicles and ATF Warmers and Oil Coolers in Arkansas.  Plaintiff Landers has also displayed, sold, serviced, and advertised its vehicles in Arkansas during the Class Period.

32.     Plaintiff Hammett is a Mississippi corporation with its principal place of business in Durant, Mississippi.  Plaintiff Hammett is an authorized Ford dealer who bought Ford-brand

**REDACTED**

vehicles containing ATF Warmers and Oil Coolers manufactured by one or more of the Defendants or their co-conspirators, as well as ATF Warmers and Oil Coolers manufactured by one or more of the Defendants or their co-conspirators, during the Class Period.

33.     During the Class Period, Plaintiff Hammett purchased vehicles containing ATF Warmers and Oil Coolers manufactured by Defendants or their co-conspirators.  Plaintiff Hammett also purchased ATF Warmers and Oil Coolers, manufactured by Defendants or their co-conspirators, for its repair and service business, during the Class Period.  Plaintiff Hammett purchased and received both the afore-mentioned vehicles and ATF Warmers and Oil Coolers in Mississippi.  Plaintiff Hammett has also displayed, sold, serviced, and advertised its vehicles in Mississippi during the Class Period.

34.     Plaintiff Superstore is a Minnesota company, with its principal place of business in White Bear Lake, Minnesota.  Plaintiff Superstore is an authorized Buick/GMC dealer, doing business under the name White Bear Lake Superstore.  Plaintiff Superstore bought Buick- and GMC-brand vehicles containing ATF Warmers and Oil Coolers manufactured by one or more of the Defendants or their co-conspirators, as well as ATF Warmers and Oil Coolers manufactured by one or more of the Defendants or their co-conspirators during the Class Period.

35.     During the Class Period, Plaintiff Superstore purchased vehicles containing ATF Warmers and Oil Coolers manufactured by one or more Defendants or their co-conspirators. Plaintiff Superstore also purchased ATF Warmers and Oil Coolers, manufactured by one or more Defendants or their co-conspirators, for its repair and service business, during the Class Period. Plaintiff Superstore purchased and received both the afore-mentioned vehicles and ATF Warmers and Oil Coolers in Minnesota.  Plaintiff Superstore has also displayed, sold, serviced, and advertised its vehicles in Minnesota during the Class Period.

**REDACTED**

36.     Plaintiff Lee is a Florida corporation, with its principal place of business in Fort Walton Beach, Florida.  Plaintiff Lee is presently an authorized GMC dealer.  During the Class Period, Plaintiff Lee was also an authorized Pontiac, Oldsmobile and Jeep dealer.  Plaintiff Lee buys GMC-brand vehicles containing ATF Warmers and Oil Coolers manufactured by one or more of the Defendants or their co-conspirators, as well as ATF Warmers and Oil Coolers manufactured by one or more of the Defendants or their co-conspirators.  During the Class Period, Plaintiff Lee bought Pontiac-, Oldsmobile-, and Jeep-brand vehicles containing ATF Warmers and Oil Coolers manufactured by one or more of the Defendants or their co-conspirators, as well as ATF Warmers and Oil Coolers manufactured by one or more of the Defendants or their co-conspirators.

37.     During the Class Period, Plaintiff Lee purchased vehicles containing ATF Warmers and Oil Coolers manufactured by one or more Defendants or their co-conspirators.  Plaintiff Lee also purchased ATF Warmers and Oil Coolers, manufactured by one or more Defendants or their co-conspirators, for its repair and service business, during the Class Period.  Plaintiff Lee purchased and received both the afore-mentioned vehicles and ATF Warmers and Oil Coolers in Florida.  Plaintiff Lee has also displayed, sold, serviced, and advertised its vehicles in Florida during the Class Period.

38.     Plaintiff Westfield is a New York company with its principal place of business in Westfield, New York.  Plaintiff Westfield is an authorized Chrysler dealer, who bought Chrysler-, Dodge-, and Jeep-brand vehicles containing ATF Warmers and Oil Coolers manufactured by one or more of the Defendants or their co-conspirators, as well as ATF Warmers and Oil Coolers manufactured by one or more of the Defendants or their co-conspirators during the Class Period.

12

REDACTED

39.     During the Class Period, Plaintiff Westfield purchased vehicles containing ATF Warmers and Oil Coolers manufactured one or more Defendants or their co-conspirators. Plaintiff Westfield also purchased ATF Warmers and Oil Coolers, manufactured by one or more Defendants or their co-conspirators, for its repair and service business, during the Class Period. Plaintiff Westfield purchased and received both the afore-mentioned vehicles and ATF Warmers and Oil Coolers in New York.  Plaintiff Westfield has also displayed, sold, serviced, and advertised its vehicles in New York during the Class Period.

40.     Plaintiff V.I.P. is a California company with its principal place of business in Palm Springs, California.  Plaintiff VIP is an authorized Mercedes, BMW, Infiniti, and Hyundai dealer who bought Mercedes-, BMW-, Infiniti-, and Hyundai-brand vehicles containing ATF Warmers and Oil Coolers manufactured by one or more of the Defendants or their co-conspirators, as well as ATF Warmers and Oil Coolers manufactured by one or more of the Defendants or their co-conspirators during the Class Period.

41.     During the Class Period, Plaintiff V.I.P. purchased vehicles containing ATF Warmers and Oil Coolers manufactured by one or more Defendants or their co-conspirators. Plaintiff V.I.P. also purchased ATF Warmers and Oil Coolers, for its repair and service business, during the Class Period.  Plaintiff V.I.P. purchased and received both the afore-mentioned vehicles and ATF Warmers and Oil Coolers in California.  Plaintiff V.I.P. has also displayed, sold, serviced, and advertised its vehicles in California during the Class Period.

42.     Plaintiff Green Team is a Kansas corporation, with its principal place of business in Clay Center, Kansas.  Plaintiff Green Team is an authorized Chrysler, Jeep, Dodge, and Ram dealer, who bought Chrysler-, Jeep-, Dodge-, and Ram-brand vehicles containing ATF Warmers and Oil Coolers manufactured by one or more of the Defendants or their co-conspirators, as well

**REDACTED**

as ATF Warmers and Oil Coolers manufactured by one or more of the Defendants or their co-conspirators, during the Class Period.

43.     During the Class Period, Plaintiff Green Team purchased vehicles containing ATF Warmers and Oil Coolers manufactured by one or more Defendants or their co-conspirators.  Plaintiff Green Team also purchased ATF Warmers and Oil Coolers, manufactured by one or more Defendants or their co-conspirators, for its repair and service business, during the Class Period.  Plaintiff Green Team purchased and received both the afore-mentioned vehicles and ATF Warmers and Oil Coolers in Kansas.  Plaintiff Green Team has also displayed, sold, serviced, and advertised its vehicles in Kansas during the Class Period.

44.     Plaintiff McGrath is a Delaware corporation, with its principal place of business in Cedar Rapids, Iowa.  Plaintiff McGrath is an authorized Buick, GMC, Chevrolet, Chrysler, Dodge, Jeep, Ram, Kia, and Cadillac dealer, who bought Buick-, GMC-, Chevrolet-, Chrysler-, Dodge-, Jeep-, Ram-, Kia-, and Cadillac-brand cars containing ATF Warmers and Oil Coolers manufactured by one or more of the Defendants or their co-conspirators, as well as ATF Warmers and Oil Coolers  manufactured by one or more of the Defendants or their co-conspirators during the Class Period.

45.     During the Class Period, Plaintiff McGrath purchased vehicles containing ATF Warmers and Oil Coolers manufactured by one or more Defendants or their co-conspirators. Plaintiff McGrath also purchased ATF Warmers and Oil Coolers, manufactured by one or more Defendants or their co-conspirators, for its repair and service business, during the Class Period. Plaintiff McGrath purchased and received both the afore-mentioned vehicles and ATF Warmers and Oil Coolers in Iowa.  Plaintiff McGrath has also displayed, sold, serviced, and advertised its vehicles in Iowa during the Class Period.

REDACTED

46.     Plaintiff Table Rock is a Nebraska corporation, with its principal place of business in Bellevue, Nebraska.  Plaintiff Table Rock is an authorized Hyundai dealer, who bought Hyundai-brand cars containing ATF Warmers and Oil Coolers manufactured by one or more of the Defendants or their co-conspirators, as well as ATF Warmers and Oil Coolers manufactured by one or more of the Defendants or their co-conspirators, during the Class Period.

47.     During the Class Period, Plaintiff Table Rock purchased vehicles containing ATF Warmers and Oil Coolers manufactured by one or more Defendants or their co-conspirators. Plaintiff Table Rock also purchased ATF Warmers and Oil Coolers, manufactured by one or more Defendants or their co-conspirators, for its repair and service business, during the Class Period.  Plaintiff Table Rock purchased and received both the afore-mentioned vehicles and ATF Warmers and Oil Coolers in Nebraska.  Plaintiff Table Rock has also displayed, sold, serviced, and advertised its vehicles in Nebraska during the Class Period.

48.     Plaintiff Archer-Perdue is a Nebraska corporation, with its principal place of business in Omaha, Nebraska.  Plaintiff Archer-Perdue is an authorized Suzuki dealer, who, during the Class Period, has bought Suzuki-brand cars containing ATF Warmers and Oil Coolers manufactured by one or more of the Defendants or their co-conspirators, as well as ATF Warmers and Oil Coolers manufactured by one or more of the Defendants or their co-conspirators.

49.     During the Class Period, Plaintiff Archer-Perdue purchased vehicles containing ATF Warmers and Oil Coolers manufactured by one or more Defendants or their co-conspirators.   Plaintiff Archer-Perdue also purchased ATF Warmers and Oil Coolers , manufactured by one or more Defendants or their co-conspirators, for its repair and service business, during the Class Period.  Plaintiff Archer-Perdue purchased and received both the

15

REDACTED

afore-mentioned vehicles and ATF Warmers and Oil Coolers in Nebraska. Plaintiff Archer-Perdue has also displayed, sold, serviced, and advertised its vehicles in Nebraska during the Class Period.

50. Plaintiff Bonneville is a New Hampshire corporation, with its principal place of business in Manchester, New Hampshire. Plaintiff Bonneville is an authorized Dodge, Chrysler, Jeep, and Ram dealer, who bought Chrysler-, Dodge-, Jeep-, and Ram-brand vehicles containing ATF Warmers and Oil Coolers manufactured by one or more of the Defendants or their co-conspirators, as well as ATF Warmers and Oil Coolers manufactured by one or more of the Defendants or their co-conspirators during the Class Period.

51. During the Class Period, Plaintiff Bonneville purchased vehicles containing ATF Warmers and Oil Coolers manufactured by one or more Defendants or their co-conspirators. Plaintiff Bonneville also purchased ATF Warmers and Oil Coolers, manufactured by one or more Defendants or their co-conspirators, for its repair and service business, during the Class Period. Plaintiff Bonneville purchased and received both the afore-mentioned vehicles and ATF Warmers and Oil Coolers in New Hampshire. Plaintiff Bonneville has also displayed, sold, serviced, and advertised its vehicles in New Hampshire during the Class Period.

52. Plaintiff Pitre is a New Mexico corporation, with its principal place of business in Albuquerque, New Mexico. Plaintiff Pitre is an authorized Buick and GMC dealer, who bought Buick- and GMC-brand vehicles containing ATF Warmers and Oil Coolers manufactured by one or more of the Defendants or their co-conspirators, as well as ATF Warmers and Oil Coolers manufactured by one or more of the Defendants or their co-conspirators, during the Class Period.

53. During the Class Period, Plaintiff Pitre purchased vehicles containing ATF Warmers and Oil Coolers manufactured by one or more Defendants or their co-conspirators.

**REDACTED**

Plaintiff Pitre also purchased ATF Warmers and Oil Coolers, manufactured by one or more Defendants or their co-conspirators, for its repair and service business, during the Class Period. Plaintiff Pitre purchased and received both the afore-mentioned vehicles and ATF Warmers and Oil Coolers in New Mexico.  Plaintiff Pitre has also displayed, sold, serviced, and advertised its vehicles in New Mexico during the Class Period.

54.     Plaintiff Patsy Lou is a Michigan corporation, with its principal place of business in Flint, Michigan.  Plaintiff Patsy Lou is an authorized Chevrolet dealer, who bought Chevrolet-brand vehicles containing ATF Warmers and Oil Coolers manufactured by one or more of the Defendants or their co-conspirators, as well as ATF Warmers and Oil Coolers manufactured by one or more of the Defendants or their co-conspirators, during the Class Period.

55.     During the Class Period, Plaintiff Patsy Lou purchased vehicles containing ATF Warmers and Oil Coolers manufactured by one or more Defendants or their co-conspirators. Plaintiff Patsy Lou also purchased ATF Warmers and Oil Coolers, manufactured by one or more Defendants or their co-conspirators, for its repair and service business, during the Class Period. Plaintiff Patsy Lou purchased and received both the afore-mentioned vehicles and ATF Warmers and Oil Coolers in Michigan.   Plaintiff Patsy Lou has also displayed, sold, serviced, and advertised its vehicles in Michigan during the Class Period.

56.     Plaintiff John Greene is a North Carolina corporation, with its principal place of business in Morganton, North Carolina.  Plaintiff John Greene is an authorized Chrysler, Dodge, Jeep, and Ram dealer, who bought Chrysler-, Dodge-, Jeep-, and Ram-brand vehicles containing ATF Warmers and Oil Coolers manufactured by one or more of the Defendants or their co-conspirators, as well as ATF Warmers and Oil Coolers manufactured by one or more of the Defendants or their co-conspirators during the Class Period.

17

REDACTED

57.     During the Class Period, Plaintiff John Greene purchased vehicles containing ATF Warmers and Oil Coolers manufactured by one or more Defendants or their co-conspirators.  Plaintiff John Greene also purchased ATF Warmers and Oil Coolers, manufactured by one or more Defendants or their co-conspirators, for its repair and service business, during the Class Period.  Plaintiff John Greene purchased and received both the afore-mentioned vehicles and ATF Warmers and Oil Coolers in North Carolina.  Plaintiff John Greene has also displayed, sold, serviced, and advertised its vehicles in North Carolina during the Class Period.

58.     Plaintiff Champion is a Nevada corporation, with its principal place of business in Reno, Nevada.  Plaintiff Champion is an authorized Chevrolet dealer, who bought Chevrolet-brand vehicles containing ATF Warmers and Oil Coolers manufactured by one or more of the Defendants or their co-conspirators, as well as ATF Warmers and Oil Coolers manufactured by one or more of the Defendants or their co-conspirators during the Class Period.

59.     During the Class Period, Plaintiff Champion purchased vehicles containing ATF Warmers and Oil Coolers manufactured by one or more Defendants or their co-conspirators.  Plaintiff Champion also purchased ATF Warmers and Oil Coolers, manufactured by one or more Defendants or their co-conspirators, for its repair and service business, during the Class Period.  Plaintiff Champion purchased and received both the afore-mentioned vehicles and ATF Warmers and Oil Coolers in Nevada.  Plaintiff Champion has also displayed, sold, serviced, and advertised its vehicles in Nevada during the Class Period.

60.     Plaintiff Commonwealth Motors is a Delaware corporation, with its principal place of business in Lawrence, Massachusetts.  Plaintiff Commonwealth Motors is an authorized Chevrolet, Honda, and Kia dealer, who bought Chevrolet-, Honda-, and Kia-brand vehicles containing ATF Warmers and Oil Coolers manufactured by one or more of the Defendants or

**REDACTED**

their co-conspirators, as well as ATF Warmers and Oil Coolers manufactured by one or more of the Defendants or their co-conspirators during the Class Period.

61.     During the Class Period, Plaintiff Commonwealth Motors purchased vehicles containing ATF Warmers and Oil Coolers manufactured by one or more Defendants or their co-conspirators.  Plaintiff Commonwealth Motors also purchased ATF Warmers and Oil Coolers, manufactured by one or more Defendants or their co-conspirators, for its repair and service business, during the Class Period.  Plaintiff Commonwealth Motors purchased and received both the afore-mentioned vehicles and ATF Warmers and Oil Coolers in Massachusetts.  Plaintiff Commonwealth Motors has also displayed, sold, serviced, and advertised its vehicles in Massachusetts during the Class Period.

62.     Plaintiff Commonwealth Volkswagen is a Massachusetts corporation with its principal place of business in Lawrence, Massachusetts.  Plaintiff Commonwealth Volkswagen is an authorized Volkswagen dealer, who bought Volkswagen-brand vehicles containing ATF Warmers and Oil Coolers manufactured by one or more of the Defendants or their co-conspirators, as well as ATF Warmers and Oil Coolers manufactured by one or more of the Defendants or their co-conspirators during the Class Period.

63.     During the Class Period, Plaintiff Commonwealth Volkswagen purchased vehicles containing ATF Warmers and Oil Coolers manufactured by one or more Defendants or their co-conspirators.  Plaintiff Commonwealth Volkswagen also purchased ATF Warmers and Oil Coolers, manufactured by one or more Defendants or their co-conspirators, for its repair and service business, during the Class Period.  Plaintiff Commonwealth Volkswagen purchased and received both the afore-mentioned vehicles and ATF Warmers and Oil Coolers in Massachusetts.

**REDACTED**

Plaintiff Commonwealth Volkswagen has also displayed, sold, serviced and advertised its vehicles in Massachusetts during the Class Period.

64.     Plaintiff Commonwealth Nissan is a Massachusetts corporation with its principal place of business in the Lawrence, Massachusetts.   Plaintiff Commonwealth Nissan is an authorized Nissan dealer, who bought Nissan-brand vehicles containing ATF Warmers and Oil Coolers manufactured by one or more of the Defendants or their co-conspirators, as well as ATF Warmers and Oil Coolers manufactured by one or more of the Defendants or their co-conspirators during the Class Period.

65.     During the Class Period, Plaintiff Commonwealth Nissan purchased vehicles containing ATF Warmers and Oil Coolers manufactured by one or more Defendants or their co-conspirators.   Plaintiff Commonwealth Nissan also purchased ATF Warmers and Oil Coolers, manufactured by one or more Defendants or their co-conspirators, for its repair and service business, during the Class Period.   Plaintiff Commonwealth Nissan purchased and received both the afore-mentioned vehicles and ATF Warmers and Oil Coolers in Massachusetts.   Plaintiff Commonwealth Nissan has also displayed, sold, serviced, and advertised its vehicles in Massachusetts during the Class Period.

66.     Plaintiff Ramey is a West Virginia company with its principal place of business in Princeton, West Virginia.   Plaintiff Ramey is an authorized Toyota, Chrysler, Dodge, Jeep, and Ram dealer, who bought Toyota-, Chrysler-, Dodge-, Jeep-, and Ram-brand vehicles containing ATF Warmers and Oil Coolers manufactured by one or more of the Defendants or their co-conspirators, as well as ATF Warmers and Oil Coolers manufactured by one or more of the Defendants or their co-conspirators during the Class Period.

REDACTED

67.     During the Class Period, Plaintiff Ramey purchased vehicles containing ATF Warmers and Oil Coolers manufactured by one or more Defendants or their co-conspirators. Plaintiff Ramey also purchased ATF Warmers and Oil Coolers, manufactured by one or more Defendants or their co-conspirators, for its repair and service business, during the Class Period. Plaintiff Ramey purchased and received both the afore-mentioned vehicles and ATF Warmers and Oil Coolers in West Virginia.  Plaintiff Ramey has also displayed, sold, serviced, and advertised its vehicles in West Virginia during the Class Period.

68.     Plaintiff Thornhill is a West Virginia corporation, with its principal place of business in Chapmanville, West Virginia.  Plaintiff Thornhill is an authorized Chevrolet, Buick, and GMC dealer, who bought Chevrolet-, Buick-, and GMC-brand vehicles containing ATF Warmers and Oil Coolers manufactured by one or more of the Defendants or their co-conspirators, as well as ATF Warmers and Oil Coolers manufactured by one or more of the Defendants or their co-conspirators during the Class Period.

69.     During the Class Period, Plaintiff Thornhill purchased vehicles containing ATF Warmers and Oil Coolers manufactured by one or more Defendants or their co-conspirators. Plaintiff Thornhill also purchased ATF Warmers and Oil Coolers, manufactured by one or more Defendants or their co-conspirators, for its repair and service business, during the Class Period. Plaintiff Thornhill purchased and received both the afore-mentioned vehicles and ATF Warmers and Oil Coolers in West Virginia.  Plaintiff Thornhill has also displayed, sold, serviced, and advertised its vehicles in West Virginia during the Class Period.

70.     Plaintiff Lakeland is a Wisconsin corporation with its principal place of business in Sheboygan, Wisconsin.  Plaintiff Lakeland is an authorized Toyota, Honda, Mazda, and Subaru dealer who bought Toyota- Honda-, Mazda-, and Subaru-brand vehicles containing ATF

REDACTED

Warmers and Oil Coolers manufactured by one or more of the Defendants or their co-conspirators, as well as ATF Warmers and Oil Coolers manufactured by one or more of the Defendants or their co-conspirators during the Class Period.

71.     During the Class Period, Plaintiff Lakeland purchased vehicles containing ATF Warmers and Oil Coolers manufactured by one or more Defendants or their co-conspirators. Plaintiff Lakeland also purchased ATF Warmers and Oil Coolers, manufactured by one or more Defendants or their co-conspirators, for its repair and service business, during the Class Period. Plaintiff Lakeland purchased and received both the afore-mentioned vehicles and ATF Warmers and Oil Coolers in Wisconsin.  Plaintiff Lakeland has also displayed, sold, serviced, and advertised its vehicles in Wisconsin during the Class Period.

72.     Plaintiff Salt Lake Valley is a Utah company, with its principal place of business in Salt Lake City, Utah.  Plaintiff Salt Lake Valley is an authorized Buick and GMC dealer, who bought Buick- and GMC-brand vehicles containing ATF Warmers and Oil Coolers manufactured by one or more of the Defendants or their co-conspirators, as well as ATF Warmers and Oil Coolers manufactured by one or more of the Defendants or their co-conspirators during the Class Period.

73.     During the Class Period, Plaintiff Salt Lake Valley purchased vehicles containing ATF Warmers and Oil Coolers manufactured by one or more Defendants or their co-conspirators.  Plaintiff Salt Lake Valley also purchased ATF Warmers and Oil Coolers, manufactured by one or more Defendants or their co-conspirators, for its repair and service business, during the Class Period.  Plaintiff Salt Lake Valley purchased and received both the afore-mentioned vehicles and ATF Warmers and Oil Coolers in Utah.  Plaintiff Salt Lake Valley has also displayed, sold, serviced, and advertised its vehicles in Utah during the Class Period.

**REDACTED**

74.     Plaintiff Capitol Chevrolet is an Oregon corporation, with its principal place of business in Salem, Oregon.  Plaintiff Capitol Chevrolet is an authorized Chevrolet, Cadillac, and Subaru dealer, who bought Chevrolet-, Cadillac-, and Subaru-brand vehicles containing ATF Warmers and Oil Coolers manufactured by one or more of the Defendants or their co-conspirators, as well as ATF Warmers and Oil Coolers manufactured by one or more of the Defendants or their co-conspirators during the Class Period.

75.     During the Class Period, Plaintiff Capitol Chevrolet purchased vehicles containing ATF Warmers and Oil Coolers manufactured by one or more Defendants or their co-conspirators.  Plaintiff Capitol Chevrolet also purchased ATF Warmers and Oil Coolers, manufactured by one or more Defendants or their co-conspirators, for its repair and service business, during the Class Period.  Plaintiff Capitol Chevrolet purchased and received both the afore-mentioned vehicles and ATF Warmers and Oil Coolers in Oregon.  Plaintiff Capitol Chevrolet has also displayed, sold, serviced, and advertised its vehicles in Oregon during the Class Period.

76.     Plaintiff Capitol Toyota is an Oregon corporation with its principal place of business in Salem, Oregon.  Plaintiff Capitol Toyota is an authorized Toyota dealer, who bought Toyota-brand vehicles containing ATF Warmers and Oil Coolers manufactured by one or more of the Defendants or their co-conspirators, as well as ATF Warmers and Oil Coolers manufactured by one or more of the Defendants or their co-conspirators during the Class Period.

77.     During the Class Period, Plaintiff Capitol Toyota purchased vehicles containing ATF Warmers and Oil Coolers manufactured by one or more Defendants or their co-conspirators.  Plaintiff Capitol Toyota also purchased ATF Warmers and Oil Coolers, manufactured by one or more Defendants or their co-conspirators, for its repair and service

**REDACTED**

business, during the Class Period.  Plaintiff Capitol Toyota purchased and received both the afore-mentioned vehicles and ATF Warmers and Oil Coolers in Oregon.  Plaintiff Capitol Toyota has also displayed, sold, serviced, and advertised its vehicles in Oregon during the Class Period.

78.     Plaintiff Wade is a Utah corporation, with its principal place of business in St. George, Utah.  Plaintiff Wade is an authorized Toyota dealer, who bought Toyota-brand cars containing ATF Warmers and Oil Coolers manufactured by the Defendants or their co-conspirators, as well as ATF Warmers and Oil Coolers manufactured by the Defendants or their co-conspirators during the Class Period.

79.     During the Class Period, Plaintiff Wade purchased vehicles containing ATF Warmers and Oil Coolers manufactured by one or more Defendants or their co-conspirators. Plaintiff Wade also purchased ATF Warmers and Oil Coolers, manufactured by one or more Defendants or their co-conspirators, for its repair and service business, during the Class Period. Plaintiff Wade purchased and received both the afore-mentioned vehicles and ATF Warmers and Oil Coolers in Utah.  Plaintiff Wade has also displayed, sold, serviced, and advertised its vehicles in Utah during the Class Period.

80.     Plaintiff Johnson is a Mississippi limited liability company, with its principal place of business in Meridian, Mississippi.  Plaintiff Johnson is an authorized Toyota dealer, who bought Toyota-brand cars containing ATF Warmers and Oil Coolers manufactured by the Defendants or their co-conspirators, as well as ATF Warmers and Oil Coolers manufactured by the Defendants or their co-conspirators during the Class Period.

81.     During the Class Period, Plaintiff Johnson purchased vehicles containing ATF Warmers and Oil Coolers manufactured by one or more Defendants or their co-conspirators.

**REDACTED**

Plaintiff Johnson also purchased ATF Warmers and Oil Coolers manufactured by one or more Defendants or their co-conspirators, for its repair and service business, during the Class Period. Plaintiff Johnson purchased and received both the afore-mentioned vehicles and ATF Warmers and Oil Coolers in Mississippi.  Plaintiff Johnson has also displayed, sold, serviced, and advertised its vehicles in Mississippi during the Class Period.

82.    Plaintiff Hartley is a New York corporation, with its principal place of business in Jamestown, New York.  During the Class Period, Plaintiff Hartley has been an authorized Honda, Buick, Pontiac, and GM dealer, who bought Honda-, Buick-, Pontiac-, and GM-brand cars containing ATF Warmers and Oil Coolers manufactured by the Defendants or their co-conspirators, as well as ATF Warmers and Oil Coolers manufactured by the Defendants or their co-conspirators.

83.    During the Class Period, Plaintiff Hartley purchased vehicles containing ATF Warmers and Oil Coolers manufactured by one or more Defendants or their co-conspirators. Plaintiff Hartley also purchased ATF Warmers and Oil Coolers manufactured by one or more Defendants or their co-conspirators, for its repair and service business, during the Class Period. Plaintiff Hartley purchased and received both the afore-mentioned vehicles and ATF Warmers and Oil Coolers in New York.  Plaintiff Hartley has also displayed, sold, serviced, and advertised its vehicles in New York during the Class Period.

84.    Plaintiff Lee Honda is a Maine corporation, with its principal place of business in Auburn, Maine.  Plaintiff Lee Honda is an authorized Honda dealer, who bought Honda-brand cars containing ATF Warmers and Oil Coolers manufactured by the Defendants or their co-conspirators, as well as ATF Warmers and Oil Coolers manufactured by the Defendants or their co-conspirators during the Class Period.

**REDACTED**

85.     During the Class Period, Plaintiff Lee Honda purchased vehicles containing ATF Warmers and Oil Coolers manufactured by one or more Defendants or their co-conspirators. Plaintiff Lee Honda also purchased ATF Warmers and Oil Coolers manufactured by one or more Defendants or their co-conspirators, for its repair and service business, during the Class Period. Plaintiff Lee Honda purchased and received both the afore-mentioned vehicles and ATF Warmers and Oil Coolers in Maine.  Plaintiff Lee Honda has also displayed, sold, serviced, and advertised its vehicles in Maine during the Class Period.

86.     Plaintiff Topsham is a Maine corporation, with its principal place of business in Topsham, Maine.  Plaintiff Topsham is an authorized Toyota dealer, who bought Toyota-brand cars containing ATF Warmers and Oil Coolers manufactured by the Defendants or their co-conspirators, as well as ATF Warmers and Oil Coolers manufactured by the Defendants or their co-conspirators during the Class Period.

87.     During the Class Period, Plaintiff Topsham purchased vehicles containing ATF Warmers and Oil Coolers manufactured by one or more Defendants or their co-conspirators. Plaintiff Topsham also purchased ATF Warmers and Oil Coolers manufactured by one or more Defendants or their co-conspirators, for its repair and service business, during the Class Period. Plaintiff Topsham purchased and received both the afore-mentioned vehicles and ATF Warmers and Oil Coolers in Maine.  Plaintiff Topsham has also displayed, sold, serviced, and advertised its vehicles in Maine during the Class Period.

88.     Plaintiff Cannon Nissan is a Mississippi limited liability company with its principal place of business in Jackson, Mississippi.  Plaintiff Cannon is an authorized Nissan dealer, who bought Nissan-brand cars containing ATF Warmers and Oil Coolers manufactured

**REDACTED**

by the Defendants or their co-conspirators, as well as ATF Warmers and Oil Coolers manufactured by the Defendants or their co-conspirators during the Class Period.

89.     During the Class Period, Plaintiff Cannon Nissan purchased vehicles containing ATF Warmers and Oil Coolers manufactured by one or more Defendants or their co-conspirators.   Plaintiff Cannon Nissan also purchased ATF Warmers and Oil Coolers, manufactured by one or more Defendants or their co-conspirators, for its repair and service business, during the Class Period.   Plaintiff Cannon purchased and received both the afore-mentioned vehicles and ATF Warmers and Oil Coolers in Mississippi.   Plaintiff Cannon has also displayed, sold, serviced, and advertised its vehicles in Mississippi during the Class Period.

90.     Plaintiff Shearer is a Vermont corporation with its principal place of business in Rutland, Vermont.   Plaintiff Shearer is an authorized Honda dealer, who bought Honda-brand vehicles containing ATF Warmers and Oil Coolers manufactured by one or more of the Defendants or their co-conspirators, as well as ATF Warmers and Oil Coolers manufactured by one or more of the Defendants or their co-conspirators during the Class Period.

91.     During the Class Period, Plaintiff Shearer purchased vehicles containing ATF Warmers and Oil Coolers manufactured by one or more Defendants or their co-conspirators. Plaintiff Shearer also purchased ATF Warmers and Oil Coolers manufactured by one or more Defendants or their co-conspirators, for its repair and service business, during the Class Period. Plaintiff Shearer purchased and received both the afore-mentioned vehicles and ATF Warmers and Oil Coolers in Vermont.   Plaintiff Shearer has also displayed, sold, serviced and advertised its vehicles in Vermont during the Class Period.

92.     Plaintiff Empire Nissan is a California limited liability company with its principal place of business in Santa Rosa, California.   Plaintiff Empire Nissan is an authorized Nissan

**REDACTED**

dealer, who bought Nissan-brand vehicles containing ATF Warmers and Oil Coolers manufactured by one or more of the Defendants or their co-conspirators, as wells as ATF Warmers and Oil Coolers manufactured by one or more of the Defendants or their co-conspirators during the Class Period.

93.     During the Class Period, Plaintiff Empire Nissan purchased vehicles containing ATF Warmers and Oil Coolers manufactured by one or more Defendants or their co-conspirators.   Plaintiff Empire Nissan also purchased ATF Warmers and Oil Coolers manufactured by one or more Defendants or their co-conspirators, for its repair and service business, during the class period.  Plaintiff Empire Nissan purchased and received both the afore-mentioned vehicles and ATF Warmers and Oil Coolers in California.  Plaintiff Empire Nissan has also displayed, sold, serviced, and advertised its vehicles in California during the Class Period.

94.     Plaintiff Hodges is a Michigan corporation with its principal place of business in Ferndale, Michigan. Plaintiff Hodges is an authorized Subaru dealer, who bought Subaru-brand vehicles containing ATF Warmers and Oil Coolers manufactured by one or more of the Defendants or their co-conspirators, as well as ATF Warmers and Oil Coolers manufactured by one or more of the Defendants or their co-conspirators during the Class Period.

95.     During the Class Period, Plaintiff Hodges purchased vehicles containing ATF Warmers and Oil Coolers manufactured by one or more Defendants or their co-conspirators. Plaintiff Hodges also purchased ATF Warmers and Oil Coolers manufactured by one or more Defendants or their co-conspirators, for its repair and service business, during the class period. Plaintiff Hodges purchased and received both the afore-mentioned vehicles and ATF Warmers

**REDACTED**

and Oil Coolers in Michigan.  Plaintiff Hodges has also displayed, sold, serviced, and advertised its vehicles in Michigan during the Class Period.

96.     Plaintiff Ancona is a Missouri corporation, with its principal place of business in Oalthe, Kansas during the Class Period.  Plaintiff Ancona was an authorized Honda dealer during the Class Period, who, during the Class Period, bought Honda-brand vehicles containing ATF Warmers and Oil Coolers manufactured by one or more of the Defendants or their co-conspirators, as well as ATF Warmers and Oil Coolers manufactured by one or more of the Defendants or their co-conspirators.

97.     During the Class Period, Plaintiff Ancona purchased vehicles containing ATF Warmers and Oil Coolers manufactured by one or more Defendants or their co-conspirators. Plaintiff Ancona also purchased ATF Warmers and Oil Coolers, manufactured by one or more Defendants or their co-conspirators, for its repair and service business, during the Class Period. Plaintiff Ancona purchased and received both the afore-mentioned vehicles and ATF Warmers and Oil Coolers in Kansas.  Plaintiff Ancona has also displayed, sold, serviced, and advertised its vehicles in Kansas during the Class Period.

98.     Plaintiff Pearce is a Nevada corporation, with its principal place of business in Reno, Nevada during the Class Period.  Plaintiff Pearce was an authorized Honda dealer during the Class Period, who, during the Class Period, bought Honda-brand vehicles containing ATF Warmers and Oil Coolers manufactured by one or more of the Defendants or their co-conspirators, as well as ATF Warmers and Oil Coolers manufactured by one or more of the Defendants or their co-conspirators.

99.     During the Class Period, Plaintiff Pearce purchased vehicles containing ATF Warmers and Oil Coolers manufactured by one or more Defendants or their co-conspirators.

**REDACTED**

Plaintiff Pearce also purchased ATF Warmers and Oil Coolers, manufactured by one or more Defendants or their co-conspirators, for its repair and service business, during the Class Period. Plaintiff Pearce purchased and received both the afore-mentioned vehicles and ATF Warmers and Oil Coolers in Nevada.  Plaintiff Pearce has also displayed, sold, serviced, and advertised its vehicles in Nevada during the Class Period.

100.   Plaintiff Bristol is a Tennessee limited liability company with its principal place of business in Bristol, Tennessee.  Plaintiff Bristol is an authorized Toyota dealer during the Class Period, who purchased Toyota- brand cars containing ATF Warmers and Oil Coolers manufactured by the Defendants or their co-conspirators, as well as ATF Warmers and Oil Coolers manufactured by the Defendants or their co-conspirators.

101.   During the Class Period, Plaintiff Bristol purchased vehicles containing ATF Warmers and Oil Coolers manufactured by one or more Defendants or their co-conspirators. Plaintiff Bristol also purchased ATF Warmers and Oil Coolers manufactured by one or more Defendants or their co-conspirators, for its repair and service business, during the Class Period. Plaintiff Bristol purchased and received both the afore-mentioned vehicles and ATF Warmers and Oil Coolers in Tennessee.  Plaintiff Bristol has also displayed, sold, serviced, and advertised its vehicles in Tennessee during the Class Period.

102.   Plaintiff Apex is a Vermont corporation with its principal place of business in South Burlington, Vermont.  Plaintiff Apex is an authorized Acura dealer, who bought Acura-brand vehicles containing ATF Warmers and Oil Coolers manufactured by one or more of the Defendants or their co-conspirators, as well as ATF Warmers and Oil Coolers manufactured by one or more of the Defendants or their co-conspirators during the Class Period.

**REDACTED**

103.   During the Class Period, Plaintiff Apex purchased vehicles containing ATF Warmers and Oil Coolers manufactured by one or more Defendants or their co-conspirators. Plaintiff Apex also purchased ATF Warmers and Oil Coolers, manufactured by one or more Defendants or their co-conspirators, for its repair and service business, during the Class Period. Plaintiff Apex purchased and received both the afore-mentioned vehicles and ATF Warmers and Oil Coolers in Vermont.  Plaintiff Apex has also displayed, sold, serviced and advertised its vehicles in Vermont during the Class Period.

## Defendants

104.   When Plaintiffs refer to a corporate family or companies by a single name in the Complaint, they are alleging that one or more employees or agents of entities within that corporate family engaged in conspiratorial acts on behalf of every company in that family.  The individual participants in the conspiratorial acts did not always know the corporate affiliation of their counterparts, nor did they distinguish between the entities within a corporate family.  The individual participants entered into agreements on behalf of their respective corporate families. As a result, those agents represented the entire corporate family with respect to such conduct, and the corporate family was party to the agreements that those agents reached.

### The DENSO Defendants

105.   Defendant DENSO Corporation is a Japanese corporation with its headquarters in Kariya, Japan.  DENSO Corporation – directly and/or through its subsidiaries, which it wholly owned and/or controlled – manufactured, marketed and/or sold ATF Warmers and Oil Coolers that were purchased throughout the United States, including in this District, during the Class Period, including by firms that sold such ATF Warmers and Oil Coolers to Plaintiffs and class members.

**REDACTED**

106.    Defendant DENSO International America, Inc. is a Delaware company with its principal place of business in Southfield, Michigan. It is a subsidiary of and wholly owned and/or controlled by its parent, DENSO Corporation. Defendant DENSO International America, Inc. manufactured, marketed and/or sold ATF Warmers and Oil Coolers that were purchased throughout the United States, including in this District, during the Class Period, including by firms that sold such ATF Warmers and Oil Coolers to Plaintiffs and class members. At all times during the Class Period, its activities in the United States were under the control and direction of its Japanese parent.

**The T.RAD Defendant**

107.    Defendant T.RAD Co., Ltd. is a Japanese corporation with its principal place of business in Tokyo, Japan. Defendant T.RAD Co. Ltd. – directly and/or through its subsidiaries, which it wholly owned and/or controlled – manufactured, marketed and/or sold ATF Warmers and Oil Coolers that were purchased throughout the United States, including in this District, during the Class Period, including by firms that sold such ATF Warmers and Oil Coolers to Plaintiffs and class members.

**The Calsonic Defendants**

108.    Defendant Calsonic Kansei Corporation is a Japanese corporation with its principal place of business in Saitama City, Japan. Defendant Calsonic Kansei Corporation – directly and/or through its subsidiaries, which it wholly owned and/or controlled – manufactured, marketed and/or sold ATF Warmers and Oil Coolers that were purchased throughout the United States, including this District, throughout the Class Period, including by firms that sold such ATF Warmers and Oil Coolers to Plaintiffs and class members.

REDACTED

109.    Defendant Calsonic Kansei North America, Inc. is a Delaware corporation with its principal place of business in Shelbyville, Tennessee.  It is a subsidiary of and wholly owned and/or controlled by its parent, Defendant Calsonic Kansei Corporation.  Defendant Calsonic Kansei North America, Inc. manufactured, marketed and/or sold ATF Warmers and Oil Coolers that were purchased throughout the United States, including in this District, during the Class Period, including by firms that sold such ATF Warmers and Oil Coolers to Plaintiffs and class members.  At all times during the Class Period, its activities in the United States were under the control and direction of its Japanese parent.

## AGENTS AND CO-CONSPIRATORS

110.    Each Defendant acted as the principal of or agent for the other Defendant with respect to the acts, violations, and common course of conduct alleged herein.

111.    Various persons, partnerships, sole proprietors, firms, corporations and individuals not named as defendants in this lawsuit, and individuals, the identities of which are presently unknown, have participated as co-conspirators with the Defendants in the offenses alleged in this Complaint, and have performed acts and made statements in furtherance of the conspiracy or in furtherance of the anticompetitive conduct.

112.    Whenever in this Complaint reference is made to any act, deed or transaction of any corporation or limited liability entity, the allegation means that the corporation or limited liability entity engaged in the act, deed or transaction by or through its officers, directors, agents, employees or representatives while they were actively engaged in the management, direction, control or transaction of the corporation's or limited liability entity's business or affairs.

## FACTUAL ALLEGATIONS

A.      **The ATF Warmer and Oil Cooler Industry**

**REDACTED**

113.     As stated above, ATF Warmers are devices located in the engine compartment of a vehicle that warm the automatic transmission fluid.

114.     An ATF Warmer is comprised of two adjacent pipes, one which carries a warm liquid and a second which carries the automatic transmission fluid.  As the pipe carrying the warm liquid warms, the adjacent pipe carrying the automatic transmission fluid also warms, causing the automatic transmission fluid inside the second pipe to warm as well.  An ATF Warmer helps improve fuel efficiency by reducing friction in the vehicle's transmission. See below.



115.     In gasoline engines, an ATF Warmer is a vital component that is essential for the functioning of a vehicle engine.  ATF Warmers play a key role in every vehicle that has an internal combustion engine.  Accordingly, the demand for ATF Warmers is directly linked to the number of vehicles produced per year.

116.     As stated above, Oil Coolers are devices located in the engine compartment of a vehicle that remove surplus heat from the engine oil.

117.     Similar to an ATF Warmer, an Oil Cooler is comprised of two adjacent pipes, one which carries a coolant, usually water, and a second which carries the engine oil.  As the pipe carrying the coolant cools the pipe, the adjacent pipe carrying the engine oil also cools, causing

REDACTED

the engine oil inside the second pipe to cool as well.  The engine oil is then diverted back into the transmission of the vehicle at a cooler operating temperature.  See below.



118.   ATF Warmers and Oil Coolers are structurally similar products with related functionality.  Both products either warm or cool engine fluids using the same methodology.

119.   ATF Warmers and Oil Coolers are installed by vehicle original equipment manufacturers ("OEMs") in new vehicles as part of the automotive manufacturing process. They are also installed in cars ot replace worn out, defective, or damaged ATF Warmers and Oil Coolers.

120.   For new vehicles, OEMs – mostly large automotive manufacturers – purchase ATF Warmers and Oil Coolers directly from the Defendants.  ATF Warmers and Oil Coolers may also be purchased by component manufacturers who then supply such systems to OEMs.  These component manufacturers are also called "Tier 1 Manufacturers" in the industry.  Tier 1 Manufacturers supply ATF Warmers and Oil Coolers directly to an OEM.

121.   When purchasing ATF Warmers and Oil Coolers, OEMs issue Requests for Quotations ("RFQs") to automotive parts suppliers.  These RFQs may be issued on a model-by-model basis for model-specific parts or for a specific engine to be incorporated into multiple

**REDACTED**

models. Manufacturers of ATF Warmers and Oil Coolers submit quotations, or bids, to automobile manufacturers in response to RFQs.  Typically, the bidding process for a particular model or a particular engine begins approximately three years prior to the start of production.

122.    Defendants and their co-conspirators supplied ATF Warmers and Oil Coolers to OEMs for installation in vehicles manufactured and sold in the United States and elsewhere. The Defendants and their co-conspirators manufactured ATF Warmers and Oil Coolers (a) in the United States for installation in vehicles manufactured and sold in the United States, (b) in Japan and elsewhere for export to the United States and installation in vehicles manufactured and sold in the United States, and (c) in Japan and elsewhere for installation in vehicles manufactured in Japan and elsewhere for export to and sale in the United States. Plaintiffs and members of the proposed Classes purchased ATF Warmers and Oil Coolers indirectly from one or more of the Defendants.  By way of example, By way of example, automobile dealers indirectly purchase ATF Warmers and Oil Coolers from the Defendants when they purchase new vehicles to sell or lease to consumers.  Likewise, when repairing a damaged vehicle or where the vehicle's ATF Warmers and Oil Coolers are defective, Plaintiffs and other automobile dealers indirectly purchase replacement ATF Warmers and Oil Coolers from Defendants.

123.    Replacement ATF Warmers and Oil Coolers sold by OEMs to dealerships are the same as the ATF Warmers and Oil Coolers installed in vehicles and are made by the same manufacturer who made the ATF Warmers and Oil Coolers originally installed.   Such replacement parts are not the same as aftermarket parts, which are made by different manufacturers than those who manufactured the original parts.  The prices of replacement ATF Warmers and Oil Coolers were inflated by Defendants' collusion, either as a direct effect of their conspiracy, or through umbrella effects.

REDACTED

124.

125.     The global demand for ATF Warmers and Oil Coolers is propelled by the increasing number of vehicles across the globe and the impending stringent fuel efficiency and emission norms.  North America holds the second position in the market for ATF Warmers and Oil Coolers as this region has the majority of gasoline vehicles.  The major contributor to the market in the North American region is the United States, which has the largest production of gasoline engines.

**B.      The Structure and Characteristics of the ATF Warmer and Oil Cooler Market Render the Conspiracy More Plausible**

126.     The structure and other characteristics of the ATF Warmer and Oil Cooler market in the United States is conducive to a price-fixing agreement and has made collusion particularly attractive in this market.  Specifically, the ATF Warmer and Oil Cooler market: (1) has high barriers to entry; and (2) has inelasticity of demand.

**1.      The ATF Warmer and Oil Cooler Market Has High Barriers to Entry**

127.     A collusive arrangement that raises product prices above competitive levels would, under basic economic principles, attract new entrants seeking to benefit from the supra-competitive pricing.  Where, however, there are significant barriers to entry, new entrants are less likely to enter the market. Thus, barriers to entry help to facilitate the formation and maintenance of a cartel.

128.     There are substantial barriers that preclude, reduce, or make more difficult entry into the ATF Warmer and Oil Cooler market.  A new entrant into the business would face costly and lengthy start-up costs, including multi-million dollar costs associated with manufacturing plants and equipment, energy, transportation, distribution infrastructure, skilled labor, and long-standing customer relationships.

REDACTED

129.    In addition, OEMs cannot change ATF Warmer and Oil Cooler suppliers randomly after they choose one because the OEMs design the features of their vehicles so that the ATF Warmers and Oil Coolers it purchases for a vehicle are then integrated with the electronics and mechanics of the particular vehicle model.  Thus, ATF Warmer and Oil Cooler manufacturers and OEMs must agree on a design that is unique to a particular vehicle model. It would be difficult for a new market entrant to do so.

### 2.    There is Inelasticity of Demand for ATF Warmers and Oil Coolers

130.    "Elasticity" is a term used to describe the sensitivity of supply and demand to changes in one or the other.  For example, demand is said to be "inelastic" if an increase in the price of a product results in only a small decline in the quantity sold of that product, if any.  In other words, customers have nowhere to turn for alternative, cheaper products of similar quality, and so continue to purchase despite a price increase.

131.    For a cartel to profit from raising prices above competitive levels, demand must be relatively inelastic at competitive prices.  Otherwise, increased prices would result in declining sales, revenues and profits, as customers purchased substitute products or declined to buy altogether. Inelastic demand is a market characteristic that facilitates collusion, allowing producers to raise their prices without triggering customer substitution and lost sales revenue.

132.    Demand for ATF Warmers and Oil Coolers is highly inelastic.  Demand for ATF Warmers and Oil Coolers is inelastic because there are no close substitutes for these products. In addition, customers must purchase ATF Warmers and Oil Coolers as essential parts of a vehicle, even if the prices are kept at a supra-competitive level.

### D.    Global Government Investigation into Price-Fixing in the Automotive Parts Industry

REDACTED

133.    A globally coordinated antitrust investigation is taking place in the United States, Europe, Canada and Japan, aimed at suppliers of automotive parts, including ATF Warmers and Oil Coolers.  A Japan Fair Trade Commission ("JFTC") official told a leading legal publication that the international automotive parts investigation would continue to widen because the automotive industry as a whole comprises many sub-industries. He characterized the investigation being conducted by the international antitrust authorities as "large and broad," and he declined to deny that this "would be history's largest case."

134.    The antitrust probe originated in Europe as the result of several European OEMs coming together to bring a complaint to the European Commission ("EC").  The EC and the FBI have executed surprise raids at the European and U.S. offices of several auto parts manufacturers, including certain Defendants, as part of an investigation into anticompetitive conduct related to the manufacturing and sale of automotive parts.

135.    On February 8, 2010, the EC executed surprise raids at the European offices of certain automotive parts makers as part of an investigation into anti-competitive conduct related to the manufacturing and sale of automotive parts.  The DOJ has confirmed that its automotive parts investigation is the largest criminal investigation that the Antitrust Division has ever pursued, both in terms of its scope and the potential volume of commerce affected by the illegal conduct.  The DOJ has levied more than $2.5 billion in criminal fines against various automotive parts manufacturers.

136.    In February 2010, JFTC raided the Tokyo offices of Defendant DENSO Corporation as part of an expansive investigation into collusion in the automotive parts industry dating back to at least 2000.

REDACTED

137.    The JFTC raided offices of Defendants as part of the spreading investigation into suspected price fixing of automotive parts. According to its 2011 Annual Report, Defendant DENSO Corporation's offices were searched on July 20, 2011 at various locations, including in Kariya, Aichi and some other sales branches in Japan.

138.    The DOJ has stated that it is conducting an investigation of potential antitrust activity and coordinating its investigation with antitrust regulators in Europe. "The antitrust division is investigating the possibility of anticompetitive cartel conduct of automotive electronic component suppliers," Justice Department Spokeswoman Gina Talamona said.

139.    Indeed, on February 23, 2010, around the same time as the raids by the Japanese and European competition authorities, investigators from the FBI raided three Detroit-area Japanese auto parts makers as part of a federal antitrust investigation.  The FBI executed warrants and searched the offices of these companies, including Defendant DENSO Corporation's subsidiary in Southfield, Michigan. Special Agent Sandra Berchtold said the affidavits supporting issuance of the warrants were sealed in federal court.

140.    To obtain search warrants, the United States was legally required to have probable cause, accepted by a magistrate, to believe that it would obtain evidence of an antitrust violation as a result of executing the search warrant – that is, the United States had to have evidence sufficient to warrant a person of reasonable caution to believe that raiding the offices of a seemingly lawful business would uncover evidence of antitrust violations and that claimed evidence must have been examined and accepted by a magistrate. That belief, which was recounted in sworn affidavits or testimony, must be grounded on reasonably trustworthy information.

REDACTED

### F.   Defendant T.RAD Co., Ltd. Pleads Guilty to Price-Fixing Radiators and ATF Warmers

141.   On September 26, 2013, the DOJ announced that Defendant T.RAD Co., Ltd. had agreed to pay a $13.75 million fine and to plead guilty to a one-count criminal Information charging T.RAD Co., Ltd. with participating in a combination and conspiracy to suppress and eliminate competition in the automotive parts industry by agreeing to rig bids for, and to fix, stabilize, and maintain the prices of, radiators sold to Toyota Motor Corporation and Honda Motor Company, Ltd., and ATF Warmers sold to Toyota Motor Corporation, in the United States and elsewhere, from at least as early as November 2002 and continuing until at least February 2010 in violation of the Sherman Act, 15 U.S.C. § 1.

142.   According to the criminal Information, T.RAD Co., Ltd. carried out the radiators and ATF Warmers conspiracy by:

(a)   participating in meetings, conversations, and communications to discuss the bids and price quotations to be submitted to Honda and Toyota in the United States and elsewhere;

(b)   agreeing, during those meetings, conversations, and communications, on bids and price quotations to be submitted to Honda and Toyota in the United States and elsewhere;

(c)   agreeing, during those meetings, conversations, and communications, to allocate the supply of radiators and/or ATF Warmers sold to Honda and Toyota in the United States and elsewhere on a model-by-model basis;

(d)   submitting bids, price quotations, and price adjustments to Honda and Toyota in the United States and elsewhere in accordance with the agreements reached;

(e)   selling radiators and/or ATF Warmers to Honda and Toyota in the United States and elsewhere at collusive and noncompetitive prices;

REDACTED

(f)     accepting payment for radiators and/or ATF Warmers sold to Honda and Toyota in the United States and elsewhere at collusive and noncompetitive prices;

(g)     engaging in meetings, conversations, and communications for the purpose of monitoring and enforcing adherence to the agreed-upon bid-rigging and price-fixing scheme; and

(h)     employing measures to keep their conduct secret, including but not limited to, using code names and destroying documents relating to the conspiracy.

## G.     Likely Existence of a Cooperating Defendant

143.    The Antitrust Criminal Penalty Enhancement and Reform Act ("ACPERA") provides leniency benefits for a participant in a price-fixing conspiracy that voluntarily discloses its conduct to the DOJ.  In most recent cases in which guilty pleas for price-fixing conduct have been obtained, there has been a cooperating party that has been accepted into the DOJ's ACPERA program as an "amnesty applicant." One of the leniency benefits for a conspirator that is accepted into the ACPERA program is that it is not charged with a criminal offense and is not required to plead guilty to criminal charges.

144.    In light of the multiple guilty pleas in this case, in related automotive parts antitrust cases and the DOJ's ongoing investigation into the industry, the Court may infer that there is an ACPERA "amnesty applicant" in this case.

## H.     Additional Criminal Pleadings in the Automotive Parts Industry

145.    On September 29, 2011, the DOJ announced that Furukawa Electric Co. Ltd. agreed to plead guilty and to pay a $200 million criminal fine for its role in a criminal price-fixing and bid-rigging conspiracy involving the sale of automotive wire harnesses and related products to automobile manufacturers.

REDACTED

146.   In the press release announcing the fine against Furukawa Electric Co. Ltd., Sharis A. Pozen, then the Acting Assistant Attorney General in charge of the DOJ's Antitrust Division, said that "[a]s a result of this international price-fixing and bid-rigging conspiracy, automobile manufacturers paid noncompetitive and higher prices for parts in cars sold to U.S. consumers." Ms. Pozen also stated that "[t]his cartel harmed an important industry in our nation's economy, and the Antitrust Division with the Federal Bureau of Investigation will continue to work together to ensure that these kinds of conspiracies are stopped." The press release also quoted FBI's Special Agent in Charge Andrew G. Arena, who said that "[w]hen companies partner to control and price fix bids or contracts, it undermines the foundation of the United States' economic system," and that "[t]he FBI is committed to aggressively pursuing any company involved in antitrust crimes."

147.   On January 30, 2012, the DOJ announced that Yazaki Corporation agreed to plead guilty and to pay a $470 million criminal fine and Defendant DENSO Corporation, as stated above, had agreed to plead guilty and to pay a $78 million criminal fine for their respective involvement in multiple price-fixing and bid-rigging conspiracies in the sale of automotive parts to automobile manufacturers in the United States. According to the three-count criminal Information filed against Yazaki, it engaged in three separate conspiracies: (i) to rig bids for and to fix, stabilize, and maintain the prices of, automotive wire harnesses and related products sold to certain automobile manufacturers in the United States and elsewhere; (ii) to rig bids for and to fix, stabilize, and maintain the prices of, instrument panel clusters sold to certain automobile manufacturers in the United States and elsewhere; and (iii) to fix, stabilize, and maintain the prices of fuel senders sold to an automobile manufacturer in the United States and elsewhere. According to the two-count felony charge against Defendant DENSO Corporation, it engaged in

REDACTED

conspiracies to rig bids for, and to fix, stabilize, and maintain the prices of ECUs and HCPs sold to an automobile manufacturer in the United States and elsewhere from at least as early as March 2004 and continuing until at least February 2010.

148. In the press release announcing the fines against Yazaki Corporation, its executives, and Defendant DENSO Corporation, Ms. Pozen vowed to continue the investigation into "pernicious cartel conduct that results in higher prices to American consumers . . . ." In the same press release, Special Agent in Charge Andrew G. Arena said that "[t]his criminal activity has a significant impact on the automotive manufacturers in the United States, Canada, Japan and Europe and has been occurring for at least a decade. The conduct had also affected commerce on a global scale in almost every market where automobiles are manufactured and/or sold[.]"

149. Ms. Pozen stated: "By rigging bids on wiring harnesses . . . the three companies inflated what some of their auto manufacturer clients paid, and indirectly, what consumers paid for some cars."

150. On March 26, 2012, the DOJ announced that Norihiro Imai, an executive of Defendant DENSO Corporation, agreed to serve one year and one day in a U.S. prison, pay a $20,000 criminal fine, and plead guilty to a one-count criminal Information charging him with engaging in a conspiracy to rig bids for, and to fix, stabilize and maintain the prices of HCPs sold to customers in the United States and elsewhere.

151. On April 3, 2012, the DOJ announced that G.S. Electech, Inc. agreed to plead guilty and to pay a $2.75 million criminal fine for its role in a conspiracy to rig bids for, and to fix, stabilize, and maintain the prices of, speed sensor wire assemblies used on antilock brake systems sold to an automobile manufacturer in the United States and elsewhere.

REDACTED

152.    On April 23, 2012, the DOJ announced that Fujikura Ltd. agreed to plead guilty and to pay a $20 million criminal fine for its role in a conspiracy to rig bids for, and to fix, stabilize, and maintain the prices of, automotive wire harnesses and related products sold to an automobile manufacturer in the United States and elsewhere.

153.    On April 26, 2012, the DOJ announced that Makoto Hattori, an executive of Defendant DENSO Corporation, agreed to serve fourteen months in a U.S. prison, pay a $20,000 criminal fine, and plead guilty to a one-count criminal Information charging him with engaging in a conspiracy to rig bids for, and to fix, stabilize, and maintain the prices of HCPs sold to a customer in the United States and elsewhere.

154.    On June 6, 2012, the DOJ announced that Autoliv Inc. agreed to plead guilty to a two-count criminal Information and to pay a $14.5 million criminal fine for its involvement in a combination and conspiracy to suppress competition in the automotive parts industry by (i) agreeing to rig bids for, and to fix, stabilize, and maintain the prices of, certain seatbelts sold to a Japanese automobile manufacturer; and (ii) agreeing to rig bids for, and to fix, stabilize, and maintain the prices of, certain seatbelts, airbags, and/or steering wheels sold to a Japanese automobile manufacturer.

155.    On July 30, 2012, the DOJ announced that TRW Deutschland Holding GmbH agreed to plead guilty and to pay a $5.1 million criminal fine for its involvement in a combination and conspiracy, through its employees, including high level employees of its wholly-owned subsidiaries, to suppress and eliminate competition in the automotive parts industry by agreeing to rig bids for, and to fix, stabilize, and maintain the prices of seatbelts, airbags and steering wheels sold to two German automobile manufacturers in the United States and elsewhere.

**REDACTED**

156.    On August 28, 2012, the DOJ announced that Nippon Seiki Co. Ltd. agreed to plead guilty and to pay a $1 million criminal fine for its involvement in a combination and conspiracy to suppress competition in the automotive parts industry by agreeing to rig bids for, and to fix, stabilize, and maintain the prices of, instrument panel clusters sold to an automobile manufacturer in in the United States and elsewhere.

157.    On October 30, 2012, the DOJ announced that Tokai Rika Co. Ltd. agreed to plead guilty and to pay a $17.7 million criminal fine for its involvement in a conspiracy to rig bids for, and to fix, stabilize, and maintain the prices of, HCPs sold to Toyota Motor Corporation and Toyota Motor Engineering & Manufacturing North America, Inc. in the United States and elsewhere. Tokai Rika also agreed to plead guilty to a charge of obstruction of justice related to the investigation of the antitrust violation.

158.    On February 15, 2013, Scott Hammond, the Deputy Assistant Attorney General in the DOJ's Antitrust Division, discussed the DOJ's ongoing automotive parts investigation in a Thomson Reuters article. He said "[t]he investigation is broader than what we've announced so far . . . . [The investigation] is still very much ongoing, but it already appears to be the biggest criminal antitrust investigation that we've ever encountered. *I say the biggest with respect to the impact on U.S. businesses and consumers, and the number of companies and executives that are subject to the investigation."* (emphasis added).

159.    On May 21, 2013, the DOJ announced that Yuji Suzuki, an executive of Defendant DENSO Corporation, agreed to serve sixteen months in a U.S. prison, pay a $20,000 criminal fine, and plead guilty to a two-count criminal Information for his role in a conspiracy to rig bids for, and to fix, stabilize, and maintain the prices of electronic control units and HCPs sold in the United States and elsewhere.  Also on May 21, 2013, the DOJ announced that Hiroshi

REDACTED

Watanabe an executive of Defendant DENSO Corporation, agreed to serve fifteen months in a U.S. prison, pay a $20,000 criminal fine, and plead guilty to a one-count criminal Information for his role in a conspiracy to rig bids for, and to fix, stabilize, and maintain the prices of HCPs sold in the United States and elsewhere.

160.    On July 16, 2013, the DOJ announced that Diamond Electric Mfg. Co. Ltd. agreed to plead guilty and to pay a $19 million criminal fine for its involvement in a combination and conspiracy to suppress competition in the automotive parts industry by agreeing to rig bids for, and to fix, stabilize, and maintain the prices of, ignition coils sold to automobile manufacturers in the United States and elsewhere.

161.    On July 18, 2013, Panasonic Corporation agreed to plead guilty and to pay a $45.8 million criminal fine for its role in a conspiracy to fix prices of various automotive parts including high intensity discharge ("HID") ballasts, switches and steering angle sensors installed in automobiles sold in the United States and elsewhere.

162.    On September 26, 2013, nine additional Japanese automotive suppliers agreed to plead guilty to conspiracy charges and pay more than $740 million in criminal fines for their roles in rigging the prices of more than 30 different automotive products:

        (a)    Hitachi Automotive Systems Ltd. agreed to plead guilty and to pay a $195 million criminal fine for its participation in a conspiracy to rig bids for, and to fix, stabilize and maintain the prices of certain automotive parts sold to automobile manufacturers in the United States and elsewhere;

        (b)    Mitsuba Corporation agreed to plead guilty and to pay a $135 million criminal fine for its participation in a conspiracy to rig bids for, and to fix, stabilize and maintain the prices of certain automotive parts sold to automobile

**REDACTED**

manufacturers in the United States and elsewhere.  Mitsuba also agreed to plead guilty to one count of obstruction of justice because of the company's efforts to destroy evidence ordered by a high-level U.S.-based executive after learning of the U.S. investigation of collusion in the automotive parts industry;

(c)     Mitsubishi Electric Corporation agreed to plead guilty and to pay a $190 million criminal fine for its participation in a conspiracy to rig bids for, and to fix, stabilize and maintain the prices of certain automotive parts sold to automobile manufacturers in the United States and elsewhere;

(d)     Mitsubishi Heavy Industries Ltd. agreed to plead guilty and to pay a $14.5 million criminal fine for its participation in a conspiracy to rig bids for, and to fix, stabilize and maintain the prices of compressors and condensers sold to automobile manufacturers in the United States and elsewhere;

(e)     Defendant T.RAD Co. Ltd., as stated above, agreed to plead guilty and to pay a $13.75 million criminal fine for its participation in a conspiracy to rig bids for, and to fix, stabilize and maintain the prices of radiators and ATF Warmers sold to automobile manufacturers in the United States and elsewhere;

(f)     Valeo Japan Co. Ltd. agreed to plead guilty and to pay a $13.6 million criminal fine for its participation in a conspiracy to allocate the supply of, rig bids for, and to fix, stabilize and maintain the prices of air conditioning systems sold to automobile manufacturers in the United States and elsewhere;

(g)     JTEKT Corporation agreed to plead guilty and to pay a $103.27 million criminal fine for its participation in a conspiracy to allocate markets, to rig bids for, and to fix, stabilize and maintain the prices of bearings and electric powered

**REDACTED**

steering assemblies sold to automobile manufacturers in the United States and elsewhere;

(h)     NSK Ltd. agreed to plead guilty and to pay a $68.2 million criminal fine for its participation in a conspiracy to allocate markets, to rig bids for, and to fix, stabilize and maintain the prices of bearings sold to an automobile manufacturer in the United States and elsewhere; and

(i)     Yamashita Rubber Co. Ltd. agreed to plead guilty and to pay an $11 million criminal fine for its participation in a conspiracy to rig bids for, and to fix, raise and maintain the prices of automotive anti-vibration rubber products sold in the United States and elsewhere to automobile manufacturers.

163.   On the same day, September 26, 2013, then United States Attorney General Eric Holder presented the DOJ's most recent findings in the ongoing automotive parts investigation. He stated "[t]hese international price-fixing conspiracies affected more than $5 billion in automotive parts sold to U.S. car manufacturers. In total, more than 25 million cars purchased by American consumers were affected by the illegal conduct." Then Attorney General Holder also described how the conspiracies worked: "[c]ompany executives met face to face in the United States and Japan – and talked on the phone – to reach collusive agreements to rig bids, fix prices and allocate the supply of auto parts sold to U.S. car companies. To keep their illegal conduct secret, they used code names and met in remote locations. Then they followed up with each other regularly to make sure the collusive agreements were being adhered to." Then Attorney General Holder explained that the automotive parts conspiracies "targeted U.S. manufacturing, U.S. businesses and U.S. consumers. As a result of these conspiracies, Americans paid more for their cars."

**REDACTED**

164.    The diagram below, which was prepared by the DOJ, illustrates the September 26,

2013 guilty pleas and the corresponding automotive parts to which the various manufacturers

have admitted price-fixing.



165.    On October 9, 2013, Takata Corporation announced that it agreed to pay $71.3

million to settle antitrust charges brought by the United States federal prosecutors for its role in a

conspiracy to price-fix seatbelts.

**REDACTED**

166.    On November 26, 2013, the DOJ announced that Toyo Tire & Rubber Co. Ltd. agreed to plead guilty and to pay a $120 million criminal fine for its role in two separate conspiracies to fix the prices of automotive components involving anti-vibration rubber and driveshaft parts installed in automobiles in the United States and elsewhere.

167.    On November 27, 2013, the DOJ announced that Stanley Electric Co. Ltd. agreed to plead guilty and to pay a $1.44 million criminal fine for its participation in a conspiracy to fix prices of automotive HID lamp ballasts installed in automobiles sold in the United States and elsewhere.

168.    On January 16, 2014, the DOJ announced that Koito Manufacturing Co. Ltd. agreed to plead guilty and to pay a $56.6 million criminal fine for its roles in separate price-fixing conspiracies involving automobile lighting fixtures and automotive HID lamp ballasts installed in cars sold in the United States and elsewhere.

169.    On February 3, 2014, the DOJ announced that Aisan Industry Co. Ltd. agreed to plead guilty and to pay a $6.86 million criminal fine for its role in a price-fixing conspiracy involving electronic throttle bodies sold to an automobile manufacturer in the United States and elsewhere.

170.    On February 13, 2014, the DOJ announced that Bridgestone Corp. agreed to plead guilty and to pay a $425 million criminal fine for its role in a conspiracy to fix prices of automotive anti-vibration rubber parts installed in automobiles sold in the United States and elsewhere.

171.    On February 20, 2014, the DOJ announced that Kazuaki Fujitani, a former executive of Defendant DENSO corporation, agreed to serve one year and one day in a U.S. prison and plead guilty to a one-count criminal Information charging him with obstruction of

**REDACTED**

justice for deleting numerous e-mails and electronic documents upon learning the FBI was executing a search warrant on Defendant DENSO International America, Inc. in connection with the DOJ's investigation into a conspiracy to fix the prices of HCPs installed in automobiles sold in the United States and elsewhere.

172.    On April 23, 2014, the DOJ announced that Showa Corp. agreed to plead guilty and to pay a $19.9 million criminal fine for its role in a conspiracy to fix prices and rig bids for pinion-assist type electric powered steering assemblies installed in cars sold in the United States and elsewhere.

173.    On June 30, 2014, the DOJ announced that Satoru Horisaki, a former executive of Defendant DENSO Corporation, agreed to serve one year and one day in a U.S. prison, pay a $20,000 criminal fine, and plead guilty to a one-count criminal Information charging him with participating in a conspiracy to agree upon bids and prices for, and allocate the supply of, automotive instrument panel clusters sold to Honda, in the United States and elsewhere.

174.    On August 19, 2014, the DOJ announced that NGK Sparkplug Co. Ltd. agreed to plead guilty and to pay a $52.1 million criminal fine for its role in the conspiracy to fix prices and rig bids for spark plugs, standard oxygen sensors, and air fuel ratio sensors sold to automobile manufacturers in the United States and elsewhere.

175.    On September 29, 2014, the DOJ announced that Toyoda Gosei Co. Ltd. agreed to plead guilty and to pay a $26 million criminal fine for its involvement in a combination and conspiracy to suppress competition in the automotive parts industry by agreeing to allocate sales of, to rig bids for, and to fix, stabilize, and maintain the prices of certain automotive hoses sold to Toyota in the United States and by agreeing to allocate sales of, to rig bids for, and to fix,

**REDACTED**

stabilize, and maintain the prices of, automotive airbags and steering wheels sold to Subaru and Toyota in the United States and elsewhere.

176.    On October 31, 2014, the DOJ announced that Hitachi Metals Ltd. agreed to plead guilty and to pay a $1.25 million criminal fine for its role in a conspiracy to allocate the sales of, to rig bids for, and to fix, raise, and maintain the prices of automotive brake hose sold to Toyota in the United States and elsewhere.

177.    On November 13, 2014, the DOJ announced that Aisin Seiki Co. Ltd. agreed to plead guilty and to pay a $35.8 million criminal fine for its role in a conspiracy to allocate customers of variable valve timing devices installed in cars sold to automobile manufacturers in the United States and elsewhere.

178.    On November 24, 2014, the DOJ announced that Continental Automotive Electronics LLC and Continental Automotive Korea Ltd. agreed to plead guilty and to pay a criminal fine of $4 million for their roles in a conspiracy to rig bids of instrument panel clusters installed in vehicles manufactured and sold in the United States.

179.    On January 27, 2015, the DOJ announced that Sanden Corp. agreed to plead guilty and to pay a $3.2 million criminal fine for its participation in a combination and conspiracy to suppress and eliminate competition in the automotive parts industry by agreeing to fix, stabilize, and maintain the prices of compressors used in air conditioning systems sold to Nissan in the United States and elsewhere.

180.    On March 31, 2015, the DOJ announced that Robert Bosch GmbH agreed to plead guilty and to pay a $57.8 million criminal fine for its role in a conspiracy to fix prices and rig bids for spark plugs, oxygen sensors and starter motors sold to automobile and internal combustion engine manufacturers in the United States and elsewhere.

**REDACTED**

181.    On April 28, 2015, the DOJ announced that Yamada Manufacturing Co., Ltd. agreed to plead guilty and to pay a $2.5 million criminal fine for its role in a conspiracy to rig bids for, and to fix, stabilize, and maintain the prices of steering columns sold to certain subsidiaries of Honda, in the United States and elsewhere.

182.    To date, 35 companies and 55 executives have been charged in the Antitrust Division's ongoing investigation into price-fixing and bid-rigging in the automotive parts industry. Each of the 35 companies has either pleaded guilty or agreed to plead guilty and altogether, they have agreed to pay a total of more than $2.5 billion in criminal fines.

183.    As stated by the FBI's Special Agent in Charge, Andrew G. Arena in a January 30, 2012 press release, "[t]his criminal activity has a significant impact on the automotive manufacturers in the United States, Canada, Japan and Europe and has been occurring at least a decade. The conduct had also affected commerce on a global scale in almost every market where automobiles are manufactured and/or sold."  As Mr. Arena previously said in a September 29, 2011 press release, "[w]hen companies partner to control and price fix bids or contracts, it undermines the foundation of the United States' economic system.  The FBI is committed to aggressively pursuing any company involved in antitrust crimes."

**I.    Illustrative Examples**

184.    Illustrative examples of Defendants' conspiratorial conduct in the market for ATF Warmers and Oil Coolers include, but are not limited to, the following:

**REDACTED**



**REDACTED**



**REDACTED**



REDACTED

## CLASS ACTION ALLEGATIONS

191.    Plaintiffs bring this action on behalf of themselves and as a class action under

Rule 23(a) and (b)(2) of the Federal Rules of Civil Procedure, seeking equitable and injunctive

relief on behalf of the following class (the "Nationwide Class"):

> All automobile dealers that during the Class Period, (a) Indirectly purchased ATF
> Warmer(s) and Oil Cooler(s) manufactured or sold by the Defendants, or any
> current or former subsidiary, affiliate thereof or any co-conspirator, or (b)
> purchased vehicles containing ATF Warmer(s) and Oil Cooler(s) manufactured or
> sold by the Defendants, or any current or former subsidiary, affiliate thereof or
> any co-conspirator.

192.    Plaintiffs also bring this action on behalf of themselves and as a class action under

Rule 23(a) and (b)(3) of the Federal Rules of Civil Procedure seeking damages pursuant to state

antitrust, unfair competition, unjust enrichment, and consumer protection laws of the states

whose laws are set forth in the Second and Third Claims below, (except California as to unjust

enrichment claims), as well as unjust enrichment laws of Missouri, Massachusetts, Illinois, and

South Carolina. The states whose laws are set forth in the Second and Third Claims below, as

well as Missouri, Massachusetts, Illinois, and South Carolina are collectively referred to as the

"Indirect Purchaser States." These claims are brought by Plaintiffs on behalf of themselves and

entities in the Indirect Purchaser States listed in the Second, Third and Fourth Claims as follows

(the "Damages Class"):

> All automobile dealers in the Indirect Purchaser States that during the Class
> Period, (a) Indirectly purchased ATF Warmer(s) and Oil Cooler(s) manufactured
> or sold by the Defendants, or any current or former subsidiary, affiliate thereof or
> any co-conspirator, or (b) purchased vehicles containing ATF Warmer(s) and Oil
> Cooler(s) manufactured or sold by the Defendants, or any current or former
> subsidiary, affiliate thereof or any co-conspirator.

193.    The Nationwide Class and the Damages Class are referred to herein as the

"Classes." Excluded from the Classes are the Defendants, their parent companies, subsidiaries

and affiliates, any co-conspirators, federal governmental entities and instrumentalities of the

**REDACTED**

federal government, states and their subdivisions, agencies and instrumentalities, and persons who purchased ATF Warmers or Oil Coolers directly or for resale.

194.   While Plaintiffs do not know the exact number of the members of the Classes, Plaintiffs believe there are (at least) thousands of members in each Class.

195.   Common questions of law and fact exist as to all members of the Classes. This is particularly true given the nature of the Defendants' conspiracy, which was generally applicable to all the members of both Classes, thereby making appropriate relief with respect to the Classes as a whole. Such questions of law and fact common to the Classes include, but are not limited to:

(a)   Whether the Defendants and their co-conspirators engaged in a combination and conspiracy among themselves to fix, raise, maintain or stabilize the prices of ATF Warmers and Oil Coolers sold in the United States;

(b)   The identity of the participants of the alleged conspiracy;

(c)   The duration of the alleged conspiracy and the acts carried out by Defendants and their co-conspirators in furtherance of the conspiracy;

(d)   Whether the alleged conspiracy violated the Sherman Act, as alleged in the First Claim for Relief;

(e)   Whether the alleged conspiracy violated state antitrust, unfair competition, and/or consumer protection laws, as alleged in the Second and Third Claims for Relief;

(f)   Whether the Defendants unjustly enriched themselves to the detriment of the Plaintiffs and the members of the Classes, thereby entitling Plaintiffs and the members of the Classes to disgorgement of all benefits derived by Defendants, as alleged in the Fourth Claim for Relief;

**REDACTED**

(g)     Whether the conduct of the Defendants and their co-conspirators, as alleged in this Complaint, caused injury to the business or property of Plaintiffs and the members of the Classes;

(h)     The effect of the alleged conspiracy on the prices of ATF Warmers and Oil Coolers sold in the United States during the Class Period;

(i)     Whether Plaintiffs and the members of the Classes had any reason to know or suspect the conspiracy, or any means to discover the conspiracy;

(j)     Whether the Defendants and their co-conspirators fraudulently concealed the conspiracy's existence from Plaintiffs and the members of the Classes;

(k)     The appropriate injunctive and related equitable relief for the Nationwide Class; and

(l)     The appropriate class-wide measure of damages for the Damages Class.

196.    Plaintiffs' claims are typical of the claims of the members of the Classes, and Plaintiffs will fairly and adequately protect the interests of the Classes. Plaintiffs and all members of the Classes are similarly affected by the Defendants' wrongful conduct in that they paid artificially inflated prices for ATF Warmers and Oil Coolers purchased indirectly from the Defendants and/or their co-conspirators.

197.    Plaintiffs' claims arise out of the same common course of conduct giving rise to the claims of the other members of the Classes.  Plaintiffs' interests are coincident with, and not antagonistic to, those of the other members of the Classes. Plaintiffs are represented by counsel who are competent and experienced in the prosecution of antitrust and class action litigation.

REDACTED

198.    The questions of law and fact common to the members of the Classes predominate over any questions affecting only individual members, including legal and factual issues relating to liability and damages.

199.    Class action treatment is a superior method for the fair and efficient adjudication of the controversy, in that, among other things, such treatment will permit a large number of similarly situated persons to prosecute their common claims in a single forum simultaneously, efficiently and without the unnecessary duplication of evidence, effort and expense that numerous individual actions would engender. The benefits of proceeding through the class mechanism, including providing injured persons or entities with a method for obtaining redress for claims that might not be practicable to pursue individually, substantially outweigh any difficulties that may arise in the management of this class action.

200.    The prosecution of separate actions by individual members of the Classes would create a risk of inconsistent or varying adjudications, establishing incompatible standards of conduct for the Defendants.

## PLAINTIFFS AND THE CLASSES SUFFERED ANTITRUST INJURY

201.    The Defendants' price-fixing conspiracy had the following effects, among others:

(a)    Price competition has been restrained or eliminated with respect to ATF Warmers and Oil Coolers;

(b)    The prices of ATF Warmers and Oil Coolers have been fixed, raised, maintained, or stabilized at artificially inflated levels;

(c)    Defendants charged purchasers of their ATF Warmers and Oil Coolers inflated, fixed and stabilized prices for such ATF Warmers and Oil Coolers;

(d)    Indirect purchasers of ATF Warmers and Oil Coolers have been deprived of free and open competition; and

**REDACTED**

(e)Indirect purchasers of ATF Warmers and Oil Coolers paid artificially inflated prices.

202.    During the Class Period, Plaintiffs and the members of the Classes paid supra-competitive prices for ATF Warmers and Oil Coolers. OEMS and automotive dealers passed on inflated prices to Plaintiffs and the members of the Classes. Those overcharges have unjustly enriched Defendants.

203.    The markets for ATF Warmers and Oil Coolers and vehicles are inextricably linked and intertwined because the market for ATF Warmers and Oil Coolers exists to serve the vehicle market. Without the vehicles, the ATF Warmers and Oil Coolers have little to no value because they have no independent utility. Indeed, the demand for vehicles creates the demand for ATF Warmers and Oil Coolers. As stated in the 2010 Annual Report of Lear Corporation, an automotive parts supplier: "Our sales are driven by the number of vehicles produced by the automotive manufacturers, which is ultimately dependent on consumer fleet demand for automotive vehicles."

204.    ATF Warmers and Oil Coolers are identifiable, discrete physical products that remain essentially unchanged when incorporated into a vehicle. As a result, ATF Warmers and Oil Coolers follow a traceable physical chain of distribution from the Defendants to Plaintiffs and the members of the Classes, and costs attributable to ATF Warmers and Oil Coolers can be traced through the chain of distribution to Plaintiffs and the members of the Classes.

205.    Just as ATF Warmers and Oil Coolers can be physically traced through the supply chain, so can their price be traced to show that changes in the prices paid by direct purchasers of ATF Warmers and Oil Coolers affect prices paid by indirect purchasers of new motor vehicles containing ATF Warmers and Oil Coolers.

**REDACTED**

206.    The purpose of the conspiratorial conduct of Defendants and their co-conspirators was to raise, fix, rig or stabilize the price of ATF Warmers and Oil Coolers and, as a direct and foreseeable result, the price of new motor vehicles containing ATF Warmers and Oil Coolers. Economists have developed techniques to isolate and understand the relationship between one "explanatory" variable and a "dependent" variable in those cases when changes in the dependent variable are explained by changes in a multitude of variables, even when all such variables may be changing simultaneously. That analysis - called regression analysis - is commonly used in the real world and in litigation to determine the impact of a price increase on one cost in a product (or service) that is an assemblage of costs. Thus, it is possible to isolate and identify only the impact of an increase in the price of ATF Warmers and Oil Coolers on prices for new motor vehicles even though such products contain a number of other components whose prices may be changing over time. A regression model can explain how variation in the price of ATF Warmers and Oil Coolers affects changes in the price of new motor vehicles. In such models, the price of ATF Warmers and Oil Coolers would be treated as an independent or explanatory variable. The model can isolate how changes in the price of ATF Warmers and Oil Coolers impact the price of new motor vehicles containing ATF Warmers and Oil Coolers while controlling for the impact of other price-determining factors.

207.    The precise amount of the overcharge impacting the prices of new motor vehicles containing ATF Warmers and Oil Coolers can be measured and quantified. Commonly used and well-accepted economic models can be used to measure both the extent and the amount of the supra-competitive charge passed through the chain of distribution. Thus, the economic harm to Plaintiffs and class members can be quantified.

REDACTED

208.     On February 15, 2013, Scott Hammond, the Deputy Assistant Attorney General in the DOJ's Antitrust Division, discussed the DOJ's ongoing automotive parts investigation in a Thomson Reuters article. He said "[t]he investigation is broader than what we've announced so far . . . . [The investigation] is still very much ongoing, but it already appears to be the biggest criminal antitrust investigation that we've ever encountered. *I say the biggest with respect to the impact on U.S. businesses and consumers, and the number of companies and executives that are subject to the investigation*." (emphasis added).

209.     On September 26, 2013, then United States Attorney General Eric Holder in the Antitrust Division presented the DOJ's then most recent findings in the ongoing automotive parts investigation.  He stated "[t]hese international price fixing conspiracies affected more than $5 billion in automobile parts sold to U.S. car manufacturers. In total, more than 25 million cars purchased by American consumers were affected by the illegal conduct." Then Attorney General Holder also described how the conspiracies worked: "[c]ompany executives face to face in the United States and Japan – and talked on the phone – to reach collusive agreements to rig bids, fix prices and allocate the supply of auto parts sold to U.S. car companies. To keep their illegal conduct secret, they used code names and met in remote locations. Then they followed up with each other regularly to make sure the collusive agreements were being adhered to." Then Attorney General Holder explained that the automotive parts conspiracies "targeted U.S. manufacturing, U.S. businesses and U.S. consumers. As a result of these conspiracies, Americans paid more for their cars."

210.     By reason of the violations of the antitrust law alleged herein, Plaintiffs and the members of the Classes have sustained injury to their businesses or property, having paid higher prices for ATF Warmers and Oil Coolers than they would have paid in the absence of the

REDACTED

Defendants' illegal contract, combination, or conspiracy, and, as a result, have suffered damages in an amount presently undetermined. This is an antitrust injury of the type that the antitrust laws were meant to punish and prevent.

## PLAINTIFFS' CLAIMS ARE NOT BARRED BY THE STATUTE OF LIMITATIONS

### A.   The Statute of Limitations Did Not Begin to Run Because Plaintiffs Did Not and Could Not Discover Their Claims

211.    Plaintiffs repeat and re-allege the allegations set forth above.

212.    Plaintiffs and members of the Classes had no knowledge of the combination or conspiracy alleged herein, or of facts sufficient to place them on inquiry notice of the claims set forth herein, until (at the earliest) September 26, 2013, the date the DOJ announced T.RAD Co., Ltd.'s anticipated guilty plea. Plaintiffs did not have sufficient information to place them on notice of Calsonic Defendants' and the DENSO Defendants' participation in the conspiracy until December 9, 2014, the day that the Plaintiffs received confidential information regarding their participation in the combination or conspiracy alleged herein.

213.    Plaintiffs and members of the Classes are automobile dealers who purchased automobiles or replacement ATF Warmers and Coolers.  They had no direct contact or interaction with the Defendants and had no means from which they could have discovered the combination and conspiracy described in this Complaint before September 26, 2013, the date the DOJ announced T.RAD Co., Ltd.'s anticipated guilty plea.  Plaintiffs also could not have discovered Calsonic Defendants' and the DENSO Defendants' participation in the conspiracy until December 9, 2014, when Plaintiffs received confidential information regarding their participation in the combination or conspiracy alleged herein.

214.    No information in the public domain was available to Plaintiffs and members of the Classes prior to September 26, 2013, the date the DOJ announced T.RAD Co., Ltd.'s

REDACTED

anticipated guilty plea, that revealed sufficient information to suggest that the Defendants were involved in a criminal conspiracy to price-fix and rig bids for ATF Warmers and Oil Coolers. Plaintiffs and members of the Classes had no means of obtaining any facts or information concerning any aspect of Defendants' dealings with OEMs or other direct purchasers, much less the fact that they and their co-conspirators had engaged in the combination and conspiracy alleged herein.

215.    For these reasons, the statute of limitations as to Plaintiffs' and the Classes' claims did not begin to run, and has been tolled with respect to the claims that Plaintiffs and members of the Classes have alleged in this Complaint.

**B.  <u>Fraudulent Concealment Tolled the Statute of Limitations</u>**

216.    In the alternative, application of the doctrine of fraudulent concealment tolled the statute of limitations on the claims asserted herein by Plaintiffs and the Classes. Plaintiffs and members of the Classes did not discover, and could not discover through the exercise of reasonable diligence, the existence of the conspiracy alleged herein until September 26, 2013, the date the DOJ announced T.RAD Co., Ltd.'s anticipated guilty plea. ████████████████

████████████████████████████████████████

████████████████████████████████████████

████████████████████

217.    Because Defendants' agreements, understandings, and conspiracies were kept secret until September 26, 2013, Plaintiffs and members of the Classes were unaware of Defendants' unlawful conduct before that time, and did not know before then that they were paying supra-competitive prices for ATF Warmers and Oil Coolers throughout the United States during the Class Period. No information, actual or constructive, was ever made available to

66

**REDACTED**

Plaintiffs and members of the Classes that even hinted to Plaintiffs that they were being injured by Defendants' unlawful conduct.

218.    The affirmative acts of Defendants alleged herein, including acts in furtherance of the conspiracy, were wrongfully concealed and carried out in a manner that precluded detection.

219.    Specifically, as Attorney General Holder explained in connection with the DOJ's globally coordinated investigation into price-fixing in the Automotive parts industry, "[i]n order to keep their illegal conduct secret, [Defendants] used code names and met in remote locations."

220.    As stated in the criminal Information filed against Defendant T.RAD Co., Ltd., the Defendant T.RAD Co., Ltd. carried out the radiators and ATF Warmers conspiracies by, among other things, "employing measures to keep their conduct secret, including but not limited to, using code names and destroying documents relating to the conspiracy."

221.    Also, a former executive of Defendant DENSO, Kazuaki Fujitani, pleaded guilty to a charge of obstruction of justice in which he admitted that he "corruptly destroyed and concealed a record and document, that is, by deleting numerous emails and electronic files" for a separate, but related, automotive part.

222.    By its very nature, the Defendants' anticompetitive conspiracy and unlawful combinations were inherently self-concealing. ATF Warmers and Oil Coolers are not exempt from antitrust regulation and, thus, Plaintiffs and members of the Classes reasonably considered the ATF Warmers and Oil Coolers industry to be a competitive industry. Defendants met and communicated in secret and agreed to keep the facts about their collusive conduct from being discovered by any member of the public or by the OEMs and other direct purchasers with whom they did business. Accordingly, a reasonable person under the circumstances would not have been alerted to begin to investigate the legitimacy of Defendants' ATF Warmers and Oil Coolers

**REDACTED**

prices before September 26, 2013, the date the DOJ announced T.RAD Co., Ltd.'s anticipated guilty plea, ██████████████████████████████████████████████████████████

██████████████████████████████████████████████████████████

223.    Plaintiffs and the members of the Classes could not have discovered the alleged combination or conspiracy at an earlier date by the exercise of reasonable diligence because of the deceptive practices and techniques of secrecy employed by the Defendants and their co-conspirators to avoid detection of, and fraudulently conceal, their contract, combination, or conspiracy.

224.    Throughout the course of the conspiracy, the Defendants met and communicated in secret to conceal their conspiracy from the public and avoid detection thereof. The conspirators also coordinated their pricing in a manner to avoid detection by the OEMs. Above and beyond their acts in furtherance of the conspiracy, such as acts of bid rigging, Defendants engaged in surreptitious activity such as using code names. The conspirators also coordinated their pricing in a manner to avoid detection by the OEMs. The exact dates and times of these meetings are within the knowledge of the Defendants, including those Defendants and executives of those Defendants who have pleaded guilty to criminal violations of the Sherman Act.

225.    Because the alleged conspiracy was both self-concealing and affirmatively concealed by Defendants and their co-conspirators, Plaintiffs and members of the Classes had no knowledge of the alleged conspiracy, or of any facts or information that would have caused a reasonably diligent person to investigate whether a conspiracy existed, until September 26, 2013, the date the DOJ announced T.RAD Co., Ltd.'s anticipated guilty plea for its role in the criminal price-fixing conspiracy alleged herein. ██████████████████████████████████████████

**REDACTED**

█████████████████████████████████████████████████

███████

226.    As a result of Defendants' fraudulent concealment of their conspiracy, the running of any statute of limitations has been tolled with respect to any claims that Plaintiffs and the members of the Classes have alleged in this Complaint.

## FIRST CLAIM FOR RELIEF
### Violation of Section 1 of the Sherman Act
### (on behalf of Plaintiffs and the Nationwide Class)

227.    Plaintiffs incorporate by reference the allegations in the preceding paragraphs.

228.    Defendants and unnamed co-conspirators entered into and engaged in a contract, combination, or conspiracy an unreasonable restraint of trade in violation of Section 1 of the Sherman Act (15 U.S.C. § 1).

229.    The acts done by the Defendants as part of, and in furtherance of, their and their co-conspirators' contract, combination, or conspiracy were authorized, ordered, or done by their officers, agents, employees, or representatives while actively engaged in the management of their affairs.

230.    During the Class Period, Defendants and their co-conspirators entered into a continuing agreement, understanding and conspiracy in restraint of trade to artificially fix, raise, stabilize, and control prices for ATF Warmers and Oil Coolers, thereby creating anticompetitive effects.

231.    The anticompetitive acts were intentionally directed at the United States market for ATF Warmers and Oil Coolers and had a substantial and foreseeable effect on interstate commerce by raising and fixing prices for these products throughout the United States.

REDACTED

232.    The conspiratorial acts and combinations have caused unreasonable restraints in the markets for ATF Warmers and Oil Coolers.

233.    As a result of Defendants' unlawful conduct, Plaintiffs and other similarly situated indirect purchasers in the Nationwide Class who purchased ATF Warmers and Oil Coolers have been harmed by being forced to pay inflated, supra-competitive prices for these products.

234.    In formulating and carrying out the alleged agreement, understanding and conspiracy, Defendants and their co-conspirators did those things that they combined and conspired to do, including but not limited to the acts, practices and course of conduct set forth herein.

235.    Defendants conspiracy had the following effects, among others:

(a)    Price competition in the market for ATF Warmers and Oil Coolers has been restrained, suppressed, and/or eliminated in the United States;

(b)    Prices for ATF Warmers and Oil Coolers sold by Defendants and their co-conspirators have been fixed, raised, maintained, and stabilized at artificially high, non-competitive levels throughout the United States;

(c)    Prices for vehicles purchased by Plaintiffs and the members of the Nationwide Class containing ATF Warmers and Oil Coolers manufactured by Defendants and their coconspirators were inflated; and

(d)    Plaintiffs and members of the Nationwide Class who purchased ATF Warmers and Oil Coolers indirectly from Defendants and their co-conspirators have been deprived of the benefits of free and open competition.

**REDACTED**

236.    Plaintiffs and members of the Nationwide Class have been injured and will continue to be injured in their business and property by paying more for ATF Warmers and Oil Coolers purchased indirectly from Defendants and their co-conspirators than they would have paid and will pay in the absence of the conspiracy.

237.    Plaintiffs and members of the Nationwide Class will continue to be subject to Defendants' price-fixing, which will deprive Plaintiffs and members of the Nationwide Class of the benefits of free competition, including competitively-priced ATF Warmers and Oil Coolers and vehicles containing ATF Warmers and Oil Coolers.

238.    Plaintiffs and members of the Nationwide Class will continue to lose funds due to overpayment for ATF Warmers and Oil Coolers and vehicles containing ATF Warmers and Oil Coolers because they are required to purchase vehicles and ATF Warmers and Oil Coolers to continue to operate their businesses.

239.    Plaintiffs and members of the Nationwide Class continue to purchase vehicles and ATF Warmers and Oil Coolers, on a regular basis.

240.    Vehicles and ATF Warmers and Oil Coolers continue to be sold at inflated and supracompetitive prices.

241.    The alleged contract, combination, or conspiracy is a *per se* violation of the federal antitrust laws.

242.    Plaintiffs and members of the Nationwide Class will be at the mercy of Defendants' unlawful conduct until the Court orders an injunction.

243.    Plaintiffs and members of the Nationwide Class are entitled to an injunction against Defendants, preventing and restraining the violations alleged herein.

**REDACTED**

## SECOND CLAIM FOR RELIEF
### Violation of State Antitrust Statutes
### (on behalf of Plaintiffs and the Damages Class)

244.    Plaintiffs incorporate by reference the allegations in the preceding paragraphs.

245.    During the Class Period, Defendants and their co-conspirators engaged in a continuing contract, combination or conspiracy with respect to the sale of ATF Warmers and Oil Coolers in unreasonable restraint of trade and commerce and in violation of the various state antitrust and other statutes set forth below.

246.    The contract, combination, or conspiracy consisted of an agreement among Defendants and their co-conspirators to fix, raise, inflate, stabilize, and/or maintain at artificially supra-competitive levels the prices for ATF Warmers and Oil Coolers and to allocate customers for these products in the United States.

247.    In formulating and effectuating this conspiracy, the Defendants and their co-conspirators performed acts in furtherance of the combination and conspiracy, including:

(a)    participating in meetings and conversations among themselves in the United States and elsewhere during which they agreed to price ATF Warmers and Oil Coolers at certain levels, and otherwise to fix, increase, inflate, maintain, or stabilize effective prices paid by Plaintiffs and members of the Damages Class with respect to ATF Warmers and Oil Coolers sold in the United States;

(b)    allocating customers and markets for ATF Warmers and Oil Coolers in the United States in furtherance of their agreements; and

(c)    participating in meetings and conversations among themselves in the United States and elsewhere to implement, adhere to, and police the unlawful agreements they reached.

**REDACTED**

248.    Defendants and their co-conspirators engaged in the actions described above for the purpose of carrying out their unlawful agreements to fix, maintain, increase, or stabilize prices and to allocate customers with respect to ATF Warmers and Oil Coolers.

249.    Defendants' anticompetitive acts described above were knowing and willful and constitute violations or flagrant violations of the following state antitrust statutes.

250.    Defendants have entered into an unlawful agreement in restraint of trade in violation of the Arizona Revised Statutes, §§ 44-1401, *et seq*.

(a)    Defendants' combinations or conspiracies had the following effects: (1) ATF Warmer and Oil Cooler price competition was restrained, suppressed, and eliminated throughout Arizona; (2) ATF Warmer and Oil Cooler prices were raised, fixed, maintained and stabilized at artificially high levels throughout Arizona; (3) Plaintiffs and members of the Damages Class were deprived of free and open competition; and (4) Plaintiffs and members of the Damages Class paid supra-competitive, artificially inflated prices for ATF Warmers and Oil Coolers.

(b)    During the Class Period, Defendants' illegal conduct substantially affected Arizona commerce.

(c)    As a direct and proximate result of Defendants' unlawful conduct, Plaintiffs and members of the Damages Class have been injured in their business and property and are threatened with further injury.

(d)    By reason of the foregoing, Defendants entered into agreements in restraint of trade in violation of Ariz. Rev. Stat. §§ 44-1401, *et seq.* Accordingly, Plaintiffs and members of the Damages Class seek all forms of relief available under Ariz. Rev. Stat. §§ 44-1401, *et seq.*

**REDACTED**

251.    Defendants have entered into an unlawful agreement in restraint of trade in violation of the California Business and Professions Code, §§ 16700, *et seq*.

(a)    During the Class Period, Defendants and their co-conspirators entered into and engaged in a continuing unlawful trust in restraint of the trade and commerce described above in violation of Section 16720, California Business and Professions Code. Defendants, each of them, have acted in violation of Section 16720 to fix, raise, stabilize, and maintain prices of, and allocate markets for, ATF Warmers and Oil Coolers at supra-competitive levels.

(b)    The aforesaid violations of Section 16720, California Business and Professions Code, consisted, without limitation, of a continuing unlawful trust and concert of action among the Defendants and their co-conspirators, the substantial terms of which were to fix, raise, maintain, and stabilize the prices of, and to allocate markets for, ATF Warmers and Oil Coolers.

(c)    For the purpose of forming and effectuating the unlawful trust, the Defendants and their co-conspirators have done those things which they combined and conspired to do, including but not limited to the acts, practices and course of conduct set forth above and the following: (1) Fixing, raising, stabilizing, and pegging the price of ATF Warmers and Oil Coolers; and (2) Allocating among themselves the production of ATF Warmers and Oil Coolers.

(d)    The combination and conspiracy alleged herein has had, *inter alia*, the following effects upon the commerce of California: (1) Price competition in the sale of ATF Warmers and Oil Coolers has been restrained, suppressed, and/or eliminated in the State of California; (2) Prices for ATF Warmers and Oil Coolers

**REDACTED**

sold by Defendants and their co-conspirators have been fixed, raised, stabilized, and pegged at artificially high, non-competitive levels in the State of California and throughout the United States; and (3) Those who purchased ATF Warmers and Oil Coolers or vehicles containing ATF Warmers and Oil Coolers manufactured by Defendants and their co-conspirators have been deprived of the benefit of free and open competition.

(e)    As a direct and proximate result of Defendants' unlawful conduct, Plaintiffs and members of the Damages Class have been injured in their business and property in that they paid more for ATF Warmers and Oil Coolers than they otherwise would have paid in the absence of Defendants' unlawful conduct. As a result of Defendants' violation of Section 16720 of the California Business and Professions Code, Plaintiffs and members of the Damages Class seek treble damages and their cost of suit, including a reasonable attorney's fee, pursuant to Section 16750(a) of the California Business and Professions Code.

252.    Defendants have entered into an unlawful agreement in restraint of trade in violation of the District of Columbia Official Code §§ 28-4501, *et seq.*

(a)    Defendants' combinations or conspiracies had the following effects: (1) ATF Warmer and Oil Cooler price competition was restrained, suppressed, and eliminated throughout the District of Columbia; (2) ATF Warmer and Oil Cooler prices were raised, fixed, maintained and stabilized at artificially high levels throughout the District of Columbia; (3) Plaintiffs and members of the Damages Class, including those who resided in the District of Columbia and/or purchased ATF Warmer and Oil Cooler or vehicles  in the District of Columbia, were

**REDACTED**

deprived of free and open competition, including in the District of Columbia; and (4) Plaintiffs and members of the Damages Class, including those who resided in the District of Columbia and/or purchased ATF Warmers and Oil Coolers or vehicles in the District of Columbia, paid supra-competitive, artificially inflated prices for ATF Warmers and Oil Coolers and vehicles containing ATF Warmers and Oil Coolers, including in the District of Columbia.

(b)    During the Class Period, Defendants' illegal conduct substantially affected District of Columbia commerce.

(c)    As a direct and proximate result of Defendants' unlawful conduct, Plaintiffs and members of the Damages Class have been injured in their business and property and are threatened with further injury.

(d)    By reason of the foregoing, Defendants have entered into agreements in restraint of trade in violation of District of Columbia Code Ann. §§ 28-4501, *et seq.* Accordingly, Plaintiffs and members of the Damages Class seek all forms of relief available under District of Columbia Code Ann. §§ 28-4501, *et seq.*

253.    Defendants have entered into an unlawful agreement in restraint of trade in violation of the Hawaii Revised Statutes Annotated §§ 480-1, *et seq.*

(a)    Defendants' combinations or conspiracies had the following effects: (1) ATF Warmer and Oil Cooler price competition was restrained, suppressed, and eliminated throughout the Hawaii; (2) ATF Warmer and Oil Cooler prices were raised, fixed, maintained and stabilized at artificially high levels throughout the Hawaii; (3) Plaintiffs and members of the Damages Class, including those who resided in the Hawaii and/or purchased ATF Warmer and Oil Cooler or vehicles

**REDACTED**

in the Hawaii, were deprived of free and open competition, including in the Hawaii; and (4) Plaintiffs and members of the Damages Class, including those who resided in the Hawaii and/or purchased ATF Warmers or Oil Coolers or vehicles in the Hawaii, paid supra-competitive, artificially inflated prices for ATF Warmers or Oil Coolers and vehicles containing ATF Warmers or Oil Coolers, including in the Hawaii.

(b)      During the Class Period, Defendants' illegal conduct substantially affected Hawaii commerce.

(c)      As a direct and proximate result of Defendants' unlawful conduct, Plaintiff and members of the Damages Class have been injured in their business and property and are threatened with further injury.

(d)      By reason of the foregoing, Defendants have entered into agreements in restraint of trade in violation of Hawaii Revised Statutes Annotated §§ 480-4, *et seq*.  Accordingly, Plaintiffs and members of the Damages Class seek all forms of relief available under Hawaii Revised Statutes Annotated §§ 480-4, *et seq*.

254.    The Defendants have entered into an unlawful agreement in restraint of trade in violation of the Iowa Code §§ 553.1, *et seq*.

(a)      Defendants' combinations or conspiracies had the following effects: (1) ATF Warmer and Oil Cooler price competition was restrained, suppressed, and eliminated throughout Iowa; (2) ATF Warmer and Oil Cooler prices were raised, fixed, maintained and stabilized at artificially high levels throughout Iowa; (3) Plaintiffs and members of the Damages Class were deprived of free and open competition; and (4) Plaintiffs and members of the Damages Class paid supra-

77

**REDACTED**

competitive, artificially inflated prices for ATF Warmers and Oil Coolers and vehicles containing ATF Warmers and Oil Coolers.

(b)    During the Class Period, Defendants' illegal conduct substantially affected Iowa commerce.

(c)    As a direct and proximate result of Defendants' unlawful conduct, Plaintiffs and members of the Damages Class have been injured in their business and property and are threatened with further injury.

(d)    By reason of the foregoing, Defendants have entered into agreements in restraint of trade in violation of Iowa Code §§ 553.1, *et seq.* Accordingly, Plaintiffs and members of the Damages Class seek all forms of relief available under Iowa Code §§ 553.1, *et seq.*

255.    Defendants have entered into an unlawful agreement in restraint of trade in violation of the Kansas Statutes Annotated, §§ 50-101, *et seq.*

(a)    Defendants' combinations or conspiracies had the following effects: (1) ATF Warmer and Oil Cooler price competition was restrained, suppressed, and eliminated throughout Kansas; (2) ATF Warmer and Oil Cooler prices were raised, fixed, maintained and stabilized at artificially high levels throughout Kansas; (3) Plaintiffs and members of the Damages Class were deprived of free and open competition; and (4) Plaintiffs and members of the Damages Class paid supra-competitive, artificially inflated prices for ATF Warmers and Oil Coolers, and vehicles containing ATF Warmers and Oil Coolers.

(b)    During the Class Period, Defendants' illegal conduct substantially affected Kansas commerce.

78

**REDACTED**

(c)     As a direct and proximate result of Defendants' unlawful conduct, Plaintiffs and members of the Damages Class have been injured in their business and property and are threatened with further injury.

(d)     By reason of the foregoing, Defendants have entered into agreements in restraint of trade in violation of Kansas Stat. Ann. §§ 50-101, *et seq.* Accordingly, Plaintiffs and members of the Damages Class seek all forms of relief available under Kansas Stat. Ann. §§ 50-101, *et seq.*

256.     Defendants have entered into an unlawful agreement in restraint of trade in violation of the Maine Revised Statutes, Maine Rev. Stat. Ann. 10, §§ 1101, *et seq.*

(a)     Defendants' combinations or conspiracies had the following effects: (1) ATF Warmer and Oil Cooler price competition was restrained, suppressed, and eliminated throughout Maine; (2) ATF Warmer and Oil Cooler prices were raised, fixed, maintained and stabilized at artificially high levels throughout Maine; (3) Plaintiffs and members of the Damages Class were deprived of free and open competition; and (4) Plaintiffs and members of the Damages Class paid supra-competitive, artificially inflated prices for ATF Warmers and Oil Coolers and vehicles containing ATF Warmers and Oil Coolers.

(b)     During the Class Period, Defendants' illegal conduct substantially affected Maine commerce.

(c)     As a direct and proximate result of Defendants' unlawful conduct, Plaintiffs and members of the Damages Class have been injured in their business and property and are threatened with further injury.

**REDACTED**

      (d)     By reason of the foregoing, Defendants have entered into agreements in restraint of trade in violation of Maine Rev. Stat. Ann. 10, §§ 1101, *et seq.* Accordingly, Plaintiffs and members of the Damages Class seek all relief available under Maine Rev. Stat. Ann. 10, §§ 1101, *et seq.*

257.    Defendants have entered into an unlawful agreement in restraint of trade in violation of the Michigan Compiled Laws Annotated §§ 445.771, *et seq.*

      (a)     Defendants' combinations or conspiracies had the following effects: (1) ATF Warmer and Oil Cooler price competition was restrained, suppressed, and eliminated throughout Michigan; (2) ATF Warmer and Oil Cooler prices were raised, fixed, maintained and stabilized at artificially high levels throughout Michigan; (3) Plaintiffs and members of the Damages Class were deprived of free and open competition; and (4) Plaintiffs and members of the Damages Class paid supra-competitive, artificially inflated prices for ATF Warmers and Oil Coolers and vehicles containing ATF Warmers and Oil Coolers.

      (b)     During the Class Period, Defendants' illegal conduct substantially affected Michigan commerce.

      (c)     As a direct and proximate result of Defendants' unlawful conduct, Plaintiffs and members of the Damages Class have been injured in their business and property and are threatened with further injury.

      (d)     By reason of the foregoing, Defendants have entered into agreements in restraint of trade in violation of Michigan Comp. Laws Ann. §§ 445.771, *et seq.* Accordingly, Plaintiffs and members of the Damages Class seek all relief available under Michigan Comp. Laws Ann. §§ 445.771, *et seq.*

**REDACTED**

258.     Defendants have entered into an unlawful agreement in unreasonable restraint of trade in violation of the Minnesota Statutes Annotated §§ 325D.49, *et seq*.

(a)     Defendants' combinations or conspiracies had the following effects: (1) ATF Warmer and Oil Cooler price competition was restrained, suppressed, and eliminated throughout Minnesota; (2) ATF Warmer and Oil Cooler prices were raised, fixed, maintained and stabilized at artificially high levels throughout Minnesota; (3) Plaintiffs and members of the Damages Class were deprived of free and open competition; and (4) Plaintiffs and members of the Damages Class paid supra-competitive, artificially inflated prices for ATF Warmers and Oil Coolers and vehicles containing ATF Warmers and Oil Coolers.

(b)     During the Class Period, Defendants' illegal conduct substantially affected Minnesota commerce.

(c)     As a direct and proximate result of Defendants' unlawful conduct, Plaintiffs and members of the Damages Class have been injured in their business and property and are threatened with further injury.

(d)     By reason of the foregoing, Defendants have entered into agreements in restraint of trade in violation of Minnesota Stat. §§ 325D.49, *et seq*. Accordingly, Plaintiffs and members of the Damages Class seek all relief available under Minnesota Stat. §§ 325D.49, *et seq*.

259.     Defendants have entered into an unlawful agreement in restraint of trade in violation of the Mississippi Code Annotated §§ 75-21-1, *et seq*.

(a)     Defendants' combinations or conspiracies had the following effects: (1) ATF Warmer and Oil Cooler price competition was restrained, suppressed, and

**REDACTED**

eliminated throughout Mississippi; (2) ATF Warmer and Oil Cooler prices were raised, fixed, maintained and stabilized at artificially high levels throughout Mississippi; (3) Plaintiffs and members of the Damages Class, including those who resided in Mississippi and/or purchased ATF Warmers and Oil Coolers or vehicles in Mississippi, were deprived of free and open competition, including in Mississippi; and (4) Plaintiffs and members of the Damages Class, including those who resided in Mississippi and/or purchased ATF Warmers and Oil Coolers or vehicles in Mississippi, paid supra-competitive, artificially inflated prices for ATF Warmers and Oil Coolers and vehicles containing ATF Warmers and Oil Coolers, including in Mississippi.

(b)    During the Class Period, Defendants' illegal conduct substantially affected Mississippi commerce.

(c)    As a direct and proximate result of Defendants' unlawful conduct, Plaintiffs and members of the Damages Class have been injured in their business and property and are threatened with further injury.

(d)    By reason of the foregoing, Defendants have entered into agreements in restraint of trade in violation of Mississippi Code Ann. §§ 75-21-1, *et seq.* Accordingly, Plaintiffs and members of the Damages Class seek all relief available under Mississippi Code Ann. §§ 75-21-1, *et seq.*

260.    Defendants have entered into an unlawful agreement in restraint of trade in violation of the Nebraska Revised Statutes §§ 59-801, *et seq.*

(a)    Defendants' combinations or conspiracies had the following effects: (1) ATF Warmer and Oil Cooler price competition was restrained, suppressed, and

**REDACTED**

eliminated throughout Nebraska; (2) ATF Warmer and Oil Cooler prices were raised, fixed, maintained and stabilized at artificially high levels throughout Nebraska; (3) Plaintiffs and members of the Damages Class were deprived of free and open competition; and (4) Plaintiffs and members of the Damages Class paid supra-competitive, artificially inflated prices for ATF Warmers and Oil Coolers and vehicles containing ATF Warmers and Oil Coolers.

(b)     During the Class Period, Defendants' illegal conduct substantially affected Nebraska commerce.

(c)     As a direct and proximate result of Defendants' unlawful conduct, Plaintiffs and members of the Damages Class have been injured in their business and property and are threatened with further injury.

(d)     By reason of the foregoing, Defendants have entered into agreements in restraint of trade in violation of Nebraska Revised Statutes §§ 59-801, *et seq*. Accordingly, Plaintiffs and members of the Damages Class seek all relief available under Nebraska Revised Statutes §§ 59-801, *et seq.*

261.     Defendants have entered into an unlawful agreement in restraint of trade in violation of the Nevada Revised Statutes Annotated §§ 598A.010, *et seq*.

(a)     Defendants' combinations or conspiracies had the following effects: (1) ATF Warmer and Oil Cooler price competition was restrained, suppressed, and eliminated throughout Nevada; (2) ATF Warmer and Oil Cooler prices were raised, fixed, maintained and stabilized at artificially high levels throughout Nevada; (3) Plaintiffs and members of the Damages Class, including those who resided in Nevada and/or purchased ATF Warmers and Oil Coolers or vehicles in

**REDACTED**

Nevada, were deprived of free and open competition, including in Nevada; and (4) Plaintiffs and members of the Damages Class, including those who resided in Nevada and/or purchased ATF Warmers and Oil Coolers or vehicles in Nevada paid supra-competitive, artificially inflated prices for ATF Warmers and Oil Coolers and vehicles containing ATF Warmers and Oil Coolers, including in Nevada.

(b)    During the Class Period, Defendants' illegal conduct substantially affected Nevada commerce.

(c)    As a direct and proximate result of Defendants' unlawful conduct, Plaintiffs and members of the Damages Class have been injured in their business and property and are threatened with further injury.

(d)    By reason of the foregoing, Defendants have entered into agreements in restraint of trade in violation of Nevada Rev. Stat. Ann. §§ 598A.010, *et seq.* Accordingly, Plaintiffs and members of the Damages Class seek all relief available under Nevada Rev. Stat. Ann. §§ 598A.010, *et seq.*

262.    Defendants have entered into an unlawful agreement in restraint of trade in violation of the New Hampshire Revised Statutes §§ 356:1, *et seq*.

(a)    Defendants' combinations or conspiracies had the following effects: (1) ATF Warmer and Oil Cooler price competition was restrained, suppressed, and eliminated throughout New Hampshire; (2) ATF Warmer and Oil Cooler prices were raised, fixed, maintained and stabilized at artificially high levels throughout New Hampshire; (3) Plaintiffs and members of the Damages Class were deprived of free and open competition; and (4) Plaintiffs and members of the Damages

**REDACTED**

Class paid supra-competitive, artificially inflated prices for ATF Warmers and Oil Coolers and vehicles containing ATF Warmers and Oil Coolers.

(b)    During the Class Period, Defendants' illegal conduct substantially affected New Hampshire commerce.

(c)    As a direct and proximate result of Defendants' unlawful conduct, Plaintiffs and members of the Damages Class have been injured in their business and property and are threatened with further injury.

(d)    By reason of the foregoing, Defendants have entered into agreements in restraint of trade in violation of New Hampshire Revised Statutes §§ 356:1, *et seq*. Accordingly, Plaintiffs and members of the Damages Class seek all relief available under New Hampshire Revised Statutes §§ 356:1, *et seq*.

263.    Defendants have entered into an unlawful agreement in restraint of trade in violation of the New Mexico Statutes Annotated §§ 57-1-1, *et seq*.

(a)    Defendants' combinations or conspiracies had the following effects: (1) ATF Warmer and Oil Cooler price competition was restrained, suppressed, and eliminated throughout New Mexico; (2) ATF Warmer and Oil Cooler prices were raised, fixed, maintained and stabilized at artificially high levels throughout New Mexico; (3) Plaintiffs and members of the Damages Class were deprived of free and open competition; and (4) Plaintiffs and members of the Damages Class paid supra-competitive, artificially inflated prices for ATF Warmers and Oil Coolers and vehicles containing ATF Warmers and Oil Coolers.

(b)    During the Class Period, Defendants' illegal conduct substantially affected New Mexico commerce.

**REDACTED**

(c)     As a direct and proximate result of Defendants' unlawful conduct, Plaintiffs and members of the Damages Class have been injured in their business and property and are threatened with further injury.

(d)     By reason of the foregoing, Defendants have entered into agreements in restraint of trade in violation of New Mexico Stat. Ann. §§ 57-1-1, *et seq.* Accordingly, Plaintiffs and members of the Damages Class seek all relief available under New Mexico Stat. Ann. §§ 57-1-1, *et seq.*

264.    Defendants have entered into an unlawful agreement in restraint of trade in violation of the New York General Business Laws §§ 340, *et seq.*

(a)     Defendants' combinations or conspiracies had the following effects: (1) ATF Warmer and Oil Cooler price competition was restrained, suppressed, and eliminated throughout New York; (2) ATF Warmer and Oil Cooler prices were raised, fixed, maintained and stabilized at artificially high levels throughout New York; (3) Plaintiffs and members of the Damages Class, including those who resided in New York and/or purchased ATF Warmers and Oil Coolers or vehicles in New York, were deprived of free and open competition, including in New York; and (4) Plaintiffs and members of the Damages Class paid supra-competitive, artificially inflated prices for ATF Warmers and Oil Coolers when they purchased including in New York, ATF Warmers and Oil Coolers or vehicles containing ATF Warmers and Oil Coolers, or purchased products that were otherwise of lower quality than they would have been absent the conspirators illegal acts, or were unable to purchase ATF Warmers and Oil

**REDACTED**

Coolers or vehicles that they otherwise would have purchased absent the illegal conduct.

(b)    During the Class Period, Defendants' illegal conduct substantially affected New York commerce.

(c)    As a direct and proximate result of Defendants' unlawful conduct, Plaintiffs and members of the Damages Class have been injured in their business and property and are threatened with further injury.

(d)    By reason of the foregoing, Defendants have entered into agreements in restraint of trade in violation of the New York Donnelly Act, §§ 340, *et seq*. The conduct set forth above is a *per se* violation of the Act. Accordingly, Plaintiffs and members of the Damages Class seek all relief available under New York Gen. Bus. Law §§ 340, *et seq*.

265.    Defendants have entered into an unlawful agreement in restraint of trade in violation of the North Carolina General Statutes §§ 75-1, *et seq*.

(a)    Defendants' combinations or conspiracies had the following effects: (1) ATF Warmer and Oil Cooler price competition was restrained, suppressed, and eliminated throughout North Carolina; (2) ATF Warmer and Oil Cooler prices were raised, fixed, maintained and stabilized at artificially high levels throughout North Carolina; (3) Plaintiffs and members of the Damages Class, including those who resided in North Carolina and/or purchased ATF Warmers and Oil Coolers or vehicles in North Carolina, were deprived of free and open competition, including in North Carolina; and (4) Plaintiffs and members of the Damages Class, including those who resided in North Carolina and/or purchased ATF Warmers

**REDACTED**

and Oil Coolers or vehicles in North Carolina, paid supra-competitive, artificially inflated prices for ATF Warmers and Oil Coolers and vehicles including in North Carolina.

(b)     During the Class Period, Defendants' illegal conduct substantially affected North Carolina commerce.

(c)     As a direct and proximate result of the Defendants' unlawful conduct, Plaintiffs and members of the Damages Class have been injured in their business and property and are threatened with further injury.

(d)     By reason of the foregoing, Defendants have entered into agreements in restraint of trade in violation of North Carolina Gen. Stat. §§ 75-1, *et seq*. Accordingly, Plaintiffs and members of the Damages Class seek all relief available under North Carolina Gen. Stat. §§ 75-1, *et. seq*.

266.     Defendants have entered into an unlawful agreement in restraint of trade in violation of the North Dakota Century Code §§ 51-08.1-01, *et seq*.

(a)     Defendants' combinations or conspiracies had the following effects: (1) ATF Warmer and Oil Cooler price competition was restrained, suppressed, and eliminated throughout North Dakota; (2) ATF Warmer and Oil Cooler prices were raised, fixed, maintained and stabilized at artificially high levels throughout North Dakota; (3) Plaintiffs and members of the Damages Class were deprived of free and open competition; and (4) Plaintiffs and members of the Damages Class paid supra-competitive, artificially inflated prices for ATF Warmers and Oil Coolers and vehicles containing ATF Warmers and Oil Coolers.

**REDACTED**

    (b)    During the Class Period, Defendants' illegal conduct had a substantial effect on North Dakota commerce.

    (c)    As a direct and proximate result of Defendants' unlawful conduct, Plaintiffs and members of the Damages Class have been injured in their business and property and are threatened with further injury.

    (d)    By reason of the foregoing, Defendants have entered into agreements in restraint of trade in violation of North Dakota Cent. Code §§ 51-08.1-01, *et seq.* Accordingly, Plaintiffs and members of the Damages Class seek all relief available under North Dakota Cent. Code §§ 51-08.1-01, *et seq.*

267.    Defendants have entered into an unlawful agreement in restraint of trade in violation of the Oregon Revised Statutes §§ 646.705, *et seq.*

    (a)    Defendants' combinations or conspiracies had the following effects: (1) ATF Warmer and Oil Cooler price competition was restrained, suppressed, and eliminated throughout Oregon; (2) ATF Warmer and Oil Cooler prices were raised, fixed, maintained and stabilized at artificially high levels throughout Oregon; (3) Plaintiffs and members of the Damages Class were deprived of free and open competition; and (4) Plaintiffs and members of the Damages Class paid supra-competitive, artificially inflated prices for ATF Warmers and Oil Coolers and vehicles containing ATF Warmers and Oil Coolers.

    (b)    During the Class Period, Defendants' illegal conduct had a substantial effect on Oregon commerce.

**REDACTED**

(c)     As a direct and proximate result of Defendants' unlawful conduct, Plaintiffs and members of the Damages Class have been injured in their business and property and are threatened with further injury.

(d)     By reason of the foregoing, Defendants have entered into agreements in restraint of trade in violation of Oregon Revised Statutes §§ 646.705, *et seq.* Accordingly, Plaintiffs and members of the Damages Class seek all relief available under Oregon Revised Statutes §§ 646.705, *et seq.*

268.     Defendants have entered into an unlawful agreement in restraint of trade in violation of the South Dakota Codified Laws §§ 37-1-3.1, *et seq.*

(a)     Defendants' combinations or conspiracies had the following effects: (1) ATF Warmer and Oil Cooler price competition was restrained, suppressed, and eliminated throughout South Dakota; (2) ATF Warmer and Oil Cooler prices were raised, fixed, maintained and stabilized at artificially high levels throughout South Dakota; (3) Plaintiffs and members of the Damages Class, including those who resided in South Dakota and/or purchased ATF Warmers and Oil Coolers or vehicles in South Dakota, were deprived of free and open competition, including in South Dakota; and (4) Plaintiffs and members of the Damages Class, including those who resided in South Dakota and/or purchased vehicles or ATF Warmers and Oil Coolers in South Dakota, paid supra-competitive, artificially inflated prices for ATF Warmers and Oil Coolers and vehicles containing ATF Warmers and Oil Coolers including in South Dakota.

(b)     During the Class Period, Defendants' illegal conduct had a substantial effect on South Dakota commerce.

**REDACTED**

(c)     As a direct and proximate result of Defendants' unlawful conduct, Plaintiffs and members of the Damages Class have been injured in their business and property and are threatened with further injury.

(d)     By reason of the foregoing, Defendants have entered into agreements in restraint of trade in violation of South Dakota Codified Laws Ann. §§ 37-1, *et seq*. Accordingly, Plaintiffs and members of the Damages Class seek all relief available under South Dakota Codified Laws Ann. §§ 37-1, *et seq*.

269.     Defendants have entered into an unlawful agreement in restraint of trade in violation of the Tennessee Code Annotated §§ 47-25-101, *et seq*.

(a)     Defendants' combinations or conspiracies had the following effects: (1) ATF Warmer and Oil Cooler price competition was restrained, suppressed, and eliminated throughout Tennessee; (2) ATF Warmer and Oil Cooler prices were raised, fixed, maintained and stabilized at artificially high levels throughout Tennessee; (3) Plaintiffs and members of the Damages Class, including those who resided in Tennessee and/or purchased ATF Warmers and Oil Coolers or vehicles in Tennessee, were deprived of free and open competition, including in Tennessee; and (4) Plaintiffs and members of the Damages Class, including those who resided in Tennessee, and/or purchased ATF Warmers and Oil Coolers or vehicles in Tennessee, paid supra-competitive, artificially inflated prices for ATF Warmers and Oil Coolers and vehicles containing ATF Warmers and Oil Coolers including in Tennessee.

(b)     During the Class Period, Defendants' illegal conduct had a substantial effect on Tennessee commerce.

91

**REDACTED**

(c)     As a direct and proximate result of the Defendants' unlawful conduct, Plaintiffs and members of the Damages Class have been injured in their business and property and are threatened with further injury.

(d)     By reason of the foregoing, Defendants have entered into agreements in restraint of trade in violation of Tennessee Code Ann. §§ 47-25-101, *et seq*. Accordingly, Plaintiffs and members of the Damages Class seek all relief available under Tennessee Code Ann. §§ 47-25-101, *et seq*.

270.     Defendants have entered into an unlawful agreement in restraint of trade in violation of the Utah Code Annotated §§ 76-10-3101, *et seq*.

(a)     Defendants' combinations or conspiracies had the following effects: (1) ATF Warmer and Oil Cooler price competition was restrained, suppressed, and eliminated throughout Utah; (2) ATF Warmer and Oil Cooler prices were raised, fixed, maintained and stabilized at artificially high levels throughout Utah; (3) Plaintiffs and members of the Damages Class were deprived of free and open competition; and (4) Plaintiffs and members of the Damages Class paid supra-competitive, artificially inflated prices for ATF Warmers and Oil Coolers and vehicles containing ATF Warmers and Oil Coolers.

(b)     During the Class Period, Defendants' illegal conduct had a substantial effect on Utah commerce.

(c)     As a direct and proximate result of Defendants' unlawful conduct, Plaintiffs and members of the Damages Class have been injured in their business and property and are threatened with further injury.

**REDACTED**

(d)     By reason of the foregoing, Defendants have entered into agreements in restraint of trade in violation of Utah Code Annotated §§ 76-10-3101, *et seq*. Accordingly, Plaintiffs and members of the Damages Class seek all relief available under Utah Code Annotated §§ 76-10-3101, *et seq*.

271.    Defendants have entered into an unlawful agreement in restraint of trade in violation of the Vermont Stat. Ann. 9 §§ 2453, *et seq*.

(a)     Defendants' combinations or conspiracies had the following effects: (1) ATF Warmer and Oil Cooler price competition was restrained, suppressed, and eliminated throughout Vermont; (2) ATF Warmer and Oil Cooler prices were raised, fixed, maintained and stabilized at artificially high levels throughout Vermont; (3) Plaintiffs and members of the Damages Class were deprived of free and open competition; and (4) Plaintiffs and members of the Damages Class paid supra-competitive, artificially inflated prices for ATF Warmers and Oil Coolers and vehicles containing ATF Warmers and Oil Coolers.

(b)     During the Class Period, Defendants' illegal conduct had a substantial effect on Vermont commerce.

(c)     As a direct and proximate result of Defendants' unlawful conduct, Plaintiffs and members of the Damages Class have been injured in their business and property and are threatened with further injury.

(d)     By reason of the foregoing, Defendants have entered into agreements in restraint of trade in violation of 9 Vermont Stat. Ann. §§ 2451, *et seq*. Plaintiffs are entitled to relief pursuant to 9 Vermont Stat. Ann. § 2465 and any other

**REDACTED**

applicable authority. Accordingly, Plaintiffs and members of the Damages Class seek all relief available under 9 Vermont Stat. Ann. §§ 2451, *et seq.*

272.    Defendants have entered into an unlawful agreement in restraint of trade in violation of the West Virginia Code §§ 47-18-1, *et seq.*

(a)    Defendants' combinations or conspiracies had the following effects: (1) ATF Warmer and Oil Cooler price competition was restrained, suppressed, and eliminated throughout West Virginia; (2) ATF Warmer and Oil Cooler prices were raised, fixed, maintained and stabilized at artificially high levels throughout West Virginia; (3) Plaintiffs and members of the Damages Class, including those who resided in West Virginia and/or purchased ATF Warmers and Oil Coolers or vehicles in West Virginia, were deprived of free and open competition, including in West Virginia; and (4) Plaintiffs and members of the Damages Class, including those who resided in West Virginia and/or purchased vehicles or ATF Warmers and Oil Coolers in West Virginia, paid supra-competitive, artificially inflated prices for ATF Warmers and Oil Coolers and vehicles containing ATF Warmers and Oil Coolers, including in West Virginia.

(b)    During the Class Period, Defendants' illegal conduct had a substantial effect on West Virginia commerce.

(c)    As a direct and proximate result of Defendants' unlawful conduct, Plaintiffs and members of the Damages Class have been injured in their business and property and are threatened with further injury.

(d)    By reason of the foregoing, Defendants have entered into agreements in restraint of trade in violation of West Virginia Code §§ 47-18-1, *et seq.*

**REDACTED**

Accordingly, Plaintiffs and members of the Damages Class seek all relief available under West Virginia Code §§ 47-18-1, *et seq*.

273.    Defendants have entered into an unlawful agreement in restraint of trade in violation of the Wisconsin Statutes §§ 133.01*, et seq*.

(a)     Defendants' combinations or conspiracies had the following effects: (1) ATF Warmer and Oil Cooler price competition was restrained, suppressed, and eliminated throughout Wisconsin; (2) ATF Warmer and Oil Cooler prices were raised, fixed, maintained and stabilized at artificially high levels throughout Wisconsin; (3) Plaintiffs and members of the Damages Class were deprived of free and open competition; and (4) Plaintiffs and members of the Damages Class paid supra-competitive, artificially inflated prices for ATF Warmers and Oil Coolers and vehicles containing ATF Warmers and Oil Coolers.

(b)     During the Class Period, Defendants' illegal conduct had a substantial effect on Wisconsin commerce.

(c)     As a direct and proximate result of Defendants' unlawful conduct, Plaintiffs and members of the Damages Class have been injured in their business and property and are threatened with further injury.

(d)     By reason of the foregoing, Defendants have entered into agreements in restraint of trade in violation of Wisconsin Stat. §§ 133.01, *et seq*. Accordingly, Plaintiffs and members of the Damages Class seek all relief available under Wisconsin Stat. §§ 133.01, *et seq*.

274.    Plaintiffs and members of the Damages Class in each of the above states have been injured in their business and property by reason of Defendants' unlawful combination,

REDACTED

contract, conspiracy and agreement. Plaintiffs and members of the Damages Class have paid more for ATF Warmers and Oil Coolers and vehicles containing ATF Warmers and Oil Coolers than they otherwise would have paid in the absence of Defendants' unlawful conduct. This injury is of the type the antitrust laws of the above states were designed to prevent and flows from that which makes Defendants' conduct unlawful.

275.    In addition, Defendants have profited significantly from the aforesaid conspiracy. Defendants' profits derived from their anticompetitive conduct come at the expense and detriment of the Plaintiffs and the members of the Damages Class.

276.    Accordingly, Plaintiffs and the members of the Damages Class in each of the above jurisdictions seek damages (including statutory damages where applicable), to be trebled or otherwise increased as permitted by a particular jurisdiction's antitrust law, and costs of suit, including reasonable attorneys' fees, to the extent permitted by the above state laws.

**THIRD CLAIM FOR RELIEF**
**Violation of State Consumer Protection Statutes**
**(on behalf of Plaintiffs and the Damages Class)**

277.    Plaintiffs incorporate and reallege, as though fully set forth herein, each and every allegation set forth in the preceding paragraphs of this Complaint.

278.    Defendants engaged in unfair competition or unfair, unconscionable, deceptive, or fraudulent acts or practices in violation of the state consumer protection and unfair competition statutes listed below.

279.     Defendants have knowingly entered into an unlawful agreement in restraint of trade in violation of the Arkansas Code Annotated, § 4-88-101, et seq.

(a)    Defendants knowingly agreed to, and did in fact, act in restraint of trade or commerce by affecting, fixing, controlling, and/or maintaining at non-competitive and artificially inflated levels, the prices at which ATF Warmers and Oil Coolers were sold,

96

**REDACTED**

distributed, or obtained in Arkansas and took efforts to conceal their agreements from Plaintiffs and members of the Damages Class.

(b)     The aforementioned conduct on the part of the Defendants constituted "unconscionable" and "deceptive" acts or practices in violation of Arkansas Code Annotated, § 4-88-107(a)(10).

(c)     Defendants' unlawful conduct had the following effects:   (1) ATF Warmer and Oil Cooler price competition was restrained, suppressed, and eliminated throughout Arkansas; (2) ATF Warmers and Oil Coolers prices were raised, fixed, maintained, and stabilized at artificially high levels throughout Arkansas; (3) Plaintiffs and the members of the Damages Class were deprived of free and open competition; and (4) Plaintiffs and the members of the Damages Class paid supra-competitive, artificially inflated prices for ATF Warmers and Oil Coolers and vehicles containing ATF Warmers and Oil Coolers.

(d)     During the Class Period, Defendants' illegal conduct substantially affected Arkansas commerce and consumers.

(e)     As a direct and proximate result of the unlawful conduct of the Defendants, Plaintiff and the members of the Damages Class have been injured in their business and property and are threatened with further injury.

(f)     Defendants have engaged in unfair competition or unfair or deceptive acts or practices in violation of Arkansas Code Annotated, § 4-88-107(a)(10) and, accordingly, Plaintiffs and the members of the Damages Class seek all relief available under that statute.

REDACTED

280.    Defendants have engaged in unfair competition or unfair, unconscionable, deceptive or fraudulent acts or practices in violation of California Business and Professions Code § 17200, *et seq.*

(a)    During the Class Period, Defendants marketed, sold, or distributed ATF Warmers and Oil Coolers(s) in California and committed and continue to commit acts of unfair competition, as defined by Sections 17200, *et seq.* of the California Business and Professions Code, by engaging in the acts and practices specified above.\

(b)    During the Class Period, the Defendants' illegal conduct substantially affected California commerce and consumers.

(c)    This claim is instituted pursuant to Sections 17203 and 17204 of the California Business and Professions Code, to obtain restitution from these Defendants for acts, as alleged herein, that violated Section 17200 of the California Business and Professions Code, commonly known as the Unfair Competition Law.

(d)    Defendants' conduct as alleged herein violated Section 17200. The acts, omissions, misrepresentations, practices, and non-disclosures of Defendants, as alleged herein, constituted a common, continuous, and continuing course of conduct of unfair competition by means of unfair, unlawful, and/or fraudulent business acts or practices within the meaning of California Business and Professions Code, Section 17200, *et seq.*, including, but not limited to, the following:  (1) the violations of Section 1 of the Sherman Act, as set forth above; (2) the violations of Section 16720, *et seq.*, of the California Business and Professions Code, set forth above;

(e)    Defendants' acts, omissions, misrepresentations, practices, and non-disclosures, as described above, whether or not in violation of Section 16720, *et seq.*, of

**REDACTED**

the California Business and Professions Code, and whether or not concerted or independent acts, are otherwise unfair, unconscionable, unlawful, or fraudulent;

(f)      Defendants' acts or practices are unfair to consumers of ATF Warmers and Oil Coolers  (or vehicles containing them) in the State of California within the meaning of Section 17200, California Business and Professions Code; and

(g)      Defendants' unlawful conduct had the following effects: (1) ATF Warmer and Oil Cooler price competition was restrained, suppressed, and eliminated throughout California; (2) ATF Warmers and Oil Coolers prices were raised, fixed, maintained, and stabilized at artificially high levels throughout California; (3) Plaintiffs and members of the Damages Class, including those who resided in California and/ or purchased ATF Warmers and Oil Coolers or vehicles in California, were deprived of free and open competition, including in California; and (4) Plaintiffs and members of the Damages Class, including those who resided in California and/or purchased ATF Warmers and Oil Coolers or vehicles in California, paid supracompetitive, artificially inflated prices for ATF Warmers and Oil Coolers and vehicles containing ATF Warmers and Oil Coolers, including in California.

(h)      Defendants' acts and practices are fraudulent or deceptive within the meaning of Section 17200 of the California Business and Professions Code.

(i)      Plaintiffs and members of the Damages Class are entitled to full restitution and/or disgorgement of all revenues, earnings, profits, compensation, and benefits that may have been obtained by Defendants as a result of such business acts or practices.

**REDACTED**

(j)     The illegal conduct alleged herein is continuing and there is no indication that Defendants will not continue such activity into the future.

(k)     As alleged in this Complaint, Defendants and their co-conspirators have been unjustly enriched as a result of their wrongful conduct and by Defendants' unfair competition.  Plaintiffs and the members of the Damages Class are accordingly entitled to equitable relief including restitution and/or disgorgement of all revenues, earnings, profits, compensation, and benefits that may have been obtained by Defendants as a result of such business practices, pursuant to the California Business and Professions Code, Sections 17203 and 17204.

281.    Defendants have engaged in unfair competition or unfair, unconscionable, or deceptive acts or practices in violation of District of Columbia Official Code § 28-3901, *et seq.*

(a)     Defendants agreed to, and did in fact, act in restraint of trade or commerce by affecting, fixing, controlling, and/or maintaining, at artificial and/or non-competitive levels, the prices at which ATF Warmers and Oil Coolers were sold, distributed, or obtained in the District of Columbia.

(b)     The foregoing conduct constitutes "unlawful trade practices," within the meaning of D.C. Code § 28-3904.

(c)     During the Class Period, the Defendants' illegal conduct substantially affected District of Columbia commerce and consumers.

(d)     Plaintiffs were not aware of Defendants' price-fixing conspiracy and were therefore unaware that they were being unfairly and illegally overcharged.  There was a gross disparity of bargaining power between the parties with respect to the price charged

**REDACTED**

by Defendants for ATF Warmers and Oil Coolers.  Defendants had the sole power to set

that price and Plaintiffs had no power to negotiate a lower price.

(e)     Moreover, Plaintiffs lacked any meaningful choice in purchasing ATF

Warmers and Oil Coolers because they were unaware of the unlawful overcharge and

because they had to purchase ATF Warmers and Oil Coolers  as a necessary part of the

vehicles they purchased.

(f)     Defendants' conduct with regard to sales of ATF Warmers and Oil

Coolers, including their illegal conspiracy to secretly fix the price of ATF Warmers and

Oil Coolers at supra-competitive levels and overcharge purchasers, was substantively

unconscionable because it was one-sided and unfairly benefited Defendants at the

expense of Plaintiffs and the public.  Defendants took grossly unfair advantage of

Plaintiffs.

(g)     Defendants' unlawful conduct had the following effects:   (1) ATF

Warmer and Oil Cooler price competition was restrained, suppressed, and eliminated

throughout the District of Columbia; (2) ATF Warmers and Oil Coolers prices were

raised, fixed, maintained, and stabilized at artificially high levels throughout the District

of Columbia; (3) Plaintiffs and the Damages Class were deprived of free and open

competition; and (4) Plaintiffs and the Damages Class paid supra-competitive,

artificially inflated prices for ATF Warmers and Oil Coolers.

(h)     The aforementioned conduct on the part of the Defendants constituted

"unconscionable trade practices," in that such conduct, inter alia, resulted in a gross

disparity between the value received by Plaintiffs and the members of the Damages

Class and the prices paid by them for ATF Warmers and Oil Coolers, due to the inflated

**REDACTED**

prices paid by Plaintiffs and Class members for vehicles and ATF Warmers and Oil Coolers.

(i)     As a direct and proximate result of Defendants' conduct, Plaintiffs and members of the Damages Class have been injured and are threatened with further injury. Defendants have engaged in unfair competition or unfair or deceptive acts or practices in violation of District of Columbia Code § 28-3901, et seq., and, accordingly, Plaintiffs and members of the Damages Class seek all relief available under that statute.

282.     Defendants have engaged in unfair competition or unfair, unconscionable, or deceptive acts or practices in violation of the Florida Deceptive and Unfair Trade Practices Act, Fla. Stat. §§ 501.201, *et seq*.

(a)     Defendants' unlawful conduct had the following effects:  (1) ATF Warmer and Oil Cooler price competition was restrained, suppressed, and eliminated throughout Florida; (2) ATF Warmers and Oil Coolers prices were raised, fixed, maintained, and stabilized at artificially high levels throughout Florida; (3) Plaintiffs and members of the Damages Class were deprived of free and open competition; and (4) Plaintiffs and members of the Damages Class paid supra-competitive, artificially inflated prices for ATF Warmers and Oil Coolers.

(b)     During the Class Period, Defendants' illegal conduct substantially affected Florida commerce and consumers.

(c)     As a direct and proximate result of Defendants' unlawful conduct, Plaintiffs and members of the Damages Class have been injured and are threatened with further injury.

**REDACTED**

      (d)     Defendants have engaged in unfair competition or unfair or deceptive acts or practices in violation of Florida Stat. § 501.201, *et seq.*, and, accordingly, Plaintiffs and members of the Damages Class seek all relief available under that statute.

283.    Defendants have engaged in unfair competition or unfair, unconscionable, or deceptive acts or practices in violation of the New Mexico Stat. § 57-12-1, *et seq.*

      (a)     Defendants and their co-conspirators agreed to, and did in fact, act in restraint of trade or commerce by affecting, fixing, controlling, and/or maintaining at non-competitive and artificially inflated levels, the prices at which ATF Warmers and Oil Coolers were sold, distributed, or obtained in New Mexico and took efforts to conceal their agreements from Plaintiffs and members of the Damages Class.

      (b)     Plaintiffs were not aware of the Defendants' price-fixing conspiracy and were therefore unaware that they were being unfairly and illegally overcharged.  There was a gross disparity of bargaining power between the parties with respect to the price charged by the Defendants for ATF Warmers and Oil Coolers.  Defendants had the sole power to set that price and Plaintiffs had no power to negotiate a lower price.  Moreover, Plaintiffs lacked any meaningful choice in purchasing ATF Warmers and Oil Coolers because they were unaware of the unlawful overcharge and because they had to purchase ATF Warmers and Oil Coolers in order to be able to operate their vehicles.  The Defendants' conduct with regard to sales of ATF Warmers and Oil Coolers, including their illegal conspiracy to secretly fix the price of ATF Warmers and Oil Coolers at supra-competitive levels and overcharge consumers, was substantively unconscionable because it was one-sided and unfairly benefited the Defendants at the expense of Plaintiffs and the public.  The Defendants took grossly unfair advantage of Plaintiffs.

**REDACTED**

(c)     The aforementioned conduct on the part of Defendants constituted "unconscionable trade practices," in violation of N.M.S.A. Stat. § 57-12-3, in that such conduct, *inter alia*, resulted in a gross disparity between the value received by Plaintiffs and the members of the Damages Class and the prices paid by them for ATF Warmers and Oil Coolers as set forth in N.M.S.A., § 57-12-2E, due to the inflated prices paid by Plaintiffs and Class members for vehicles and ATF Warmers and Oil Coolers.

(d)     Defendants' unlawful conduct had the following effects: (1) ATF Warmer and Oil Cooler price competition was restrained, suppressed, and eliminated throughout New Mexico; (2) ATF Warmers and Oil Coolers prices were raised, fixed, maintained, and stabilized at artificially high levels throughout New Mexico; (3) Plaintiffs and the members of the Damages Class were deprived of free and open competition; and (4) Plaintiffs and the members of the Damages Class paid supra-competitive, artificially inflated prices for ATF Warmers and Oil Coolers and vehicles containing ATF Warmers and Oil Coolers.

(e)     During the Class Period, Defendants' illegal conduct substantially affected New Mexico commerce and consumers.

(f)     As a direct and proximate result of the unlawful conduct of Defendants, Plaintiffs and the members of the Damages Class have been injured and are threatened with further injury.

(g)     Defendants have engaged in unfair competition or unfair or deceptive acts or practices in violation of New Mexico Stat. § 57-12-1, *et seq.*, and, accordingly, Plaintiffs and the members of the Damages Class seek all relief available under that statute.

104

REDACTED

284.    Defendants have engaged in unfair competition or unfair, unconscionable, or deceptive acts or practices in violation of N.Y. Gen. Bus. Law § 349, *et seq.*

(a)    Defendants and their co-conspirators agreed to, and did in fact, act in restraint of trade or commerce by affecting, fixing, controlling, and/or maintaining, at artificial and non-competitive levels, the prices at which ATF Warmers and Oil Coolers were sold, distributed, or obtained in New York and took efforts to conceal their agreements from Plaintiffs and members of the Damages Class.

(b)    Defendants deceptively led purchasers, such as Plaintiffs and Class members, to believe that the ATF Warmers and Oil Coolers they had purchased inside vehicles had been sold at legal competitive prices, when they had in fact been sold at collusively obtained inflated prices, that were passed on to them.

(c)    The conduct of the Defendants described herein constitutes consumer-oriented deceptive acts or practices within the meaning of N.Y. Gen. Bus. Law § 349, which resulted in consumer injury and broad adverse impact on the public at large, and harmed the public interest of New York State in an honest marketplace in which economic activity is conducted in a competitive manner.

(d)    Because of the Defendants' unlawful trade practices in the State of New York, New York purchasers who indirectly purchased ATF Warmers and Oil Coolers were misled to believe that they were paying a fair price for ATF Warmers and Oil Coolers or the price increases for ATF Warmers and Oil Coolers were for valid business reasons.

(e)    Defendants' unlawful conduct had the following effects:   (1) ATF Warmer and Oil Cooler price competition was restrained, suppressed, and eliminated

**REDACTED**

throughout New York; (2) ATF Warmers and Oil Coolers prices were raised, fixed, maintained, and stabilized at artificially high levels throughout New York; (3) Plaintiffs and members of the Damages Class, who resided in and/or made purchases of vehicles or ATF Warmers and Oil Coolers  in New York, were deprived of free and open competition and were subject to Defendants' deceptive practices in New York; and (4) Plaintiffs and members of the Damages Class, who resided in and/or made purchases of vehicles or ATF Warmers and Oil Coolers  in New York, paid supra-competitive, artificially inflated prices for ATF Warmers and Oil Coolers and vehicles containing ATF Warmers and Oil Coolers, and were subjected to Defendants' deceptive practices in New York.

(f)      Defendants knew that their unlawful trade practices with respect to pricing ATF Warmers and Oil Coolers would have an impact on all purchasers in New York and not just the Defendants' direct customers.

(g)      Defendants knew that their unlawful trade practices with respect to pricing ATF Warmers and Oil Coolers would have a broad impact, causing consumer class members who indirectly purchased ATF Warmers and Oil Coolers to be injured by paying more for ATF Warmers and Oil Coolers than they would have paid in the absence of Defendants' unlawful trade acts and practices.

(h)      During the Class Period, Defendants' marketed, sold, or distributed ATF Warmers and Oil Coolers in New York, and Defendants' illegal conduct substantially affected New York commerce and consumers.

**REDACTED**

(i)     During the Class Period, each of the Defendants named herein, directly, or indirectly and through affiliates they dominated and controlled, manufactured, sold and/or distributed ATF Warmers and Oil Coolers in New York.

(j)     Plaintiffs and members of the Damages Class seek all relief available pursuant to N.Y. Gen. Bus. Law § 349 (h).

285.    Defendants have engaged in unfair competition or unfair, unconscionable, or deceptive acts or practices in violation of North Carolina Gen. Stat. § 75-1.1, *et seq*.

(a)     Defendants and their co-conspirators agreed to, and did in fact, act in restraint of trade or commerce by affecting, fixing, controlling, and/or maintaining, at artificial and non-competitive levels, the prices at which ATF Warmers and Oil Coolers were sold, distributed, or obtained in North Carolina and took efforts to conceal their agreements from Plaintiffs and members of the Damages Class.

(b)     The conduct of the Defendants described herein constitutes consumer-oriented deceptive acts or practices within the meaning of North Carolina law, which resulted in consumer injury and broad adverse impact on the public at large, and harmed the public interest of North Carolina consumers in an honest marketplace in which economic activity is conducted in a competitive manner.

(c)     Defendants' unlawful conduct had the following effects:  (1) ATF Warmer and Oil Cooler price competition was restrained, suppressed, and eliminated throughout North Carolina; (2) ATF Warmers and Oil Coolers prices were raised, fixed, maintained, and stabilized at artificially high levels throughout North Carolina; (3) Plaintiffs and members of the Damages Class, including those who resided in North Carolina and/or purchased ATF Warmers and Oil Coolers or vehicles in North Carolina,

**REDACTED**

were deprived of free and open competition, including in North Carolina; and (4) Plaintiffs and members of the Damages Class, including those who resided in North Carolina and/or purchased ATF Warmers and Oil Coolers or vehicles in North Carolina, paid supra-competitive, artificially inflated prices for ATF Warmers and Oil Coolers and vehicles containing ATF Warmers and Oil Coolers, including in North Carolina.

(d)     During the Class Period, the Defendants' illegal conduct substantially affected North Carolina commerce and purchasers of ATF Warmers and Oil Coolers and vehicles.  The Defendants' price-fixing conspiracy could not have succeeded absent deceptive conduct by the Defendants to cover up their illegal acts.  Secrecy was integral to the formation, implementation and maintenance of the Defendants' price-fixing conspiracy.  The Defendants committed inherently deceptive and self-concealing actions, of which Plaintiffs could not possibly have been aware.  Moreover, the Defendants deceptively concealed their unlawful activities by conducting meetings and conversations in secret.

(e)     During the Class Period, each of the Defendants named herein, directly, or indirectly and through affiliates they dominated and controlled, manufactured, sold, and/or distributed ATF Warmers and Oil Coolers in North Carolina.

(f)     Plaintiffs and members of the Damages Class seek actual damages for their injuries caused by these violations in an amount to be determined at trial and are threatened with further injury.  Defendants have engaged in unfair competition or unfair or deceptive acts or practices in violation of North Carolina Gen. Stat. § 75-1.1, *et seq.*, and, accordingly, Plaintiffs and members of the Damages Class seek all relief available under that statute.

**REDACTED**

286.  Defendants have engaged in unfair competition or unfair, unconscionable, or deceptive acts or practices in violation of South Carolina Unfair Trade Practices Act, S.C. Code Ann. §§ 39-5-10, *et seq.*[2]

(a)  Defendants' combinations or conspiracies had the following effects:  (1) ATF Warmer and Oil Cooler price competition was restrained, suppressed, and eliminated throughout South Carolina; (2) ATF Warmers and Oil Coolers prices were raised, fixed, maintained, and stabilized at artificially high levels throughout South Carolina; (3) Plaintiffs and members of the Damages Class were deprived of free and open competition; and (4) Plaintiffs and members of the Damages Class paid supra-competitive, artificially inflated prices for ATF Warmers and Oil Coolers.

(b)  During the Class Period, Defendants' illegal conduct had a substantial effect on South Carolina commerce.

(c)  As a direct and proximate result of Defendants' unlawful conduct, Plaintiffs and members of the Damages Class have been injured in their business and property and are threatened with further injury.

(d)  Defendants have engaged in unfair competition or unfair or deceptive acts or practices in violation of S.C. Code Ann. §§ 39-5-10, *et seq.*, and, accordingly, Plaintiffs and the members of the Damages Class seek all relief available under that statute.

287.  Defendants have engaged in unfair competition or unfair, unconscionable, or deceptive acts or practices in violation of 9 Vermont § 2451, *et seq.*

---

[2] Plaintiffs include this claim in order to preserve appellate rights.

**REDACTED**

  (a) Defendants and their co-conspirators agreed to, and did in fact, act in restraint of trade or commerce in a market that includes Vermont by affecting, fixing, controlling, and/or maintaining, at artificial and non-competitive levels, the prices at which ATF Warmers and Oil Coolers were sold, distributed, or obtained in Vermont.

  (b) Defendants deliberately failed to disclose material facts to Plaintiffs and members of the Damages Class concerning their unlawful activities and artificially inflated prices for ATF Warmers and Oil Coolers.  Defendants owed a duty to disclose such facts.  Defendants misrepresented to all purchasers during the Class Period that their ATF Warmers and Oil Coolers prices were competitive and fair.

  (c) Defendants' unlawful conduct had the following effects:  (1) ATF Warmer and Oil Cooler price competition was restrained, suppressed, and eliminated throughout Vermont; (2) ATF Warmers and Oil Coolers prices were raised, fixed, maintained, and stabilized at artificially high levels throughout Vermont; (3) Plaintiffs and members of the Damages Class were deprived of free and open competition; and (4) Plaintiffs and members of the Damages Class paid supra-competitive, artificially inflated prices for ATF Warmers and Oil Coolers.

  (d) As a direct and proximate result of Defendants' violations of law, Plaintiffs and members of the Damages Class suffered an ascertainable loss of money or property as a result of Defendants' use or employment of unconscionable and deceptive commercial practices as set forth above.  That loss was caused by the Defendants' willful and deceptive conduct, as described herein.

  (e) Defendants' deception, including their affirmative misrepresentations and omissions concerning the price of ATF Warmers and Oil Coolers, likely misled

**REDACTED**

purchasers acting reasonably under the circumstances to believe that they were purchasing ATF Warmers and Oil Coolers at prices set by a free and fair market. Defendants' misleading conduct and unconscionable activities constitutes unfair competition or unfair or deceptive acts or practices in violation of 9 Vermont § 2451, *et seq.*, and, accordingly, Plaintiffs and members of the Damages Class seek all relief available under that statute.

### FOURTH CLAIM FOR RELIEF
### Unjust Enrichment
### (on behalf of Plaintiffs and the Damages Class)

288.    Plaintiffs incorporate and reallege, as though fully set forth herein, each and every allegation set forth in the preceding paragraphs of this Complaint.

289.    Plaintiffs bring this claim under the laws of all states listed in the Second and Third Claims, *supra.*, except California. Plaintiffs also bring this claim under the laws of Missouri, Massachusetts, South Carolina and Illinois on behalf of the Plaintiffs who have their primary places of business in those states and the class members in those three states.

290.    As a result of their unlawful conduct described above, Defendants have and will continue to be unjustly enriched.  Defendants have been unjustly enriched by the receipt of, at a minimum, unlawfully inflated prices and unlawful profits on sales of ATF Warmers and Oil Coolers.

291.    Defendants have benefited from their unlawful acts, and it would be inequitable for Defendants to be permitted to retain any of the ill-gotten gains resulting from the overpayments made by Plaintiffs or the members of the Damages Class for ATF Warmers and Oil Coolers.

REDACTED

292.    Plaintiffs and the members of the Damages Class are entitled to the amount of Defendants' ill-gotten gains resulting from their unlawful, unjust, and inequitable conduct. Plaintiffs and the members of the Damages Class are entitled to the establishment of a constructive trust consisting of all ill-gotten gains from which Plaintiffs and the members of the Damages Class may make claims on a pro rata basis.

293.    Pursuit of any remedies against the firms from whom Plaintiffs and the members of the Damages Class purchased ATF Warmers and Oil Coolers and vehicles containing ATF Warmers and Oil Coolers subject to the Defendants' conspiracy would have been futile, given that those firms did not take part in the Defendants' conspiracy.

## PRAYER FOR RELIEF

Accordingly, Plaintiffs respectfully request that:

A.    The Court determine that this action may be maintained as a class action under Rule 23(a), (b)(2) and (b)(3) of the Federal Rules of Civil Procedure, and direct that reasonable notice of this action, as provided by Rule 23(c)(2) of the Federal Rules of Civil Procedure, be given to each and every member of the Classes;

B.    That the unlawful conduct, contract, conspiracy, or combination alleged herein be adjudged and decreed:

(a)    An unreasonable restraint of trade or commerce in violation of Section 1 of the Sherman Act;

(b)    A *per se* violation of Section 1 of the Sherman Act;

(c)    An unlawful combination, trust, agreement, understanding and/or concert of action in violation of the state antitrust and unfair competition and consumer protection laws as set forth herein; and

**REDACTED**

    (d)    Acts of unjust enrichment by Defendants as set forth herein.

C.    Plaintiffs and the members of the Damages Class recover damages, to the maximum extent allowed under such laws, and that a joint and several judgment in favor of Plaintiffs and the members of the Damages Class be entered against Defendants in an amount to be trebled to the extent such laws permit;

D.    Plaintiffs and the members of the Damages Class recover damages, to the maximum extent allowed by such laws, in the form of restitution and/or disgorgement of profits unlawfully gained from them;

E.    Defendants, their affiliates, successors, transferees, assignees and other officers, directors, partners, agents and employees thereof, and all other persons acting or claiming to act on their behalf or in concert with them, be permanently enjoined and restrained from in any manner continuing, maintaining or renewing the conduct, contract, conspiracy, or combination alleged herein, or from entering into any other contract, conspiracy, or combination having a similar purpose or effect, and from adopting or following any practice, plan, program, or device having a similar purpose or effect;

F.    Plaintiffs and the members of the Damages Class be awarded restitution, including disgorgement of profits Defendants obtained as a result of their acts of unfair competition and acts of unjust enrichment;

G.    Plaintiffs and the members of the Classes be awarded pre- and post- judgment interest as provided by law, and that such interest be awarded at the highest legal rate from and after the date of service of this Complaint;

H.    Plaintiffs and the members of the Classes recover their costs of suit, including reasonable attorneys' fees, as provided by law; and

REDACTED

I.      Plaintiffs and members of the Classes have such other and further relief as the

case may require and the Court may deem just and proper.

## **JURY DEMAND**

Plaintiffs demand a trial by jury, pursuant to Rule 38(b) of the Federal Rules of Civil

Procedure, of all issues so triable.


DATED:  September 30, 2015                    Respectfully submitted,


                                             /s/  *Gerard V. Mantese*
                                             Gerard V. Mantese
                                             (Michigan Bar No. P34424)
                                             Alexander E. Blum
                                             (Michigan Bar No. P74070)
                                             Mantese Honigman P.C.
                                             1361 E. Big Beaver Road
                                             Troy, Michigan 48083
                                             Telephone: (248) 457-9200
                                             gmantese@manteselaw.com
                                             ablum@manteselaw.com


Don Barrett                              Jonathan W. Cuneo
Brian Herrington                         Joel Davidow
David McMullan                           Daniel Cohen
Barrett Law Group, P.A.                  Victoria Romanenko
P.O. Box 927                             Cuneo Gilbert & LaDuca, LLP
404 Court Square                         507 C Street, N.E.
Lexington, MS 39095                      Washington, DC 20002
Telephone: (662) 834-2488                Telephone: (202) 789-3960
dbarrett@barrettlawgroup.com             jonc@cuneolaw.com
bherrington@barrettlawgroup.com          joel@cuneolaw.com
dmcmullan@barrettlawgroup.com            danielc@cuneolaw.com
                                         vicky@cuneolaw.com


Shawn M. Raiter                          Michael J. Flannery
Larson • King, LLP                       Cuneo Gilbert & LaDuca, LLP
2800 Wells Fargo Place                   300 North Tucker
30 East Seventh Street                   Suite 801
St. Paul, MN  55101                      St. Louis, MO  63101

**REDACTED**

Telephone: (651) 312-6500
sraiter@larsonking.com

Phillip Duncan
Richard Quintus
Duncan Firm, P.A.
900 S. Shackleford, Suite 725
Little Rock, AR 72211
Telephone:  (501) 228-7600
phillip@duncanfirm.com
richard@duncanfirm.com

Dewitt Lovelace
Valerie Nettles
Lovelace & Associates, P.A.
Suite 200
12870 US Hwy 98 West
Miramar Beach, FL  32550
Telephone: (850) 837-6020
dml@lovelacelaw.com
alex@lovelacelaw.com

Gregory Johnson
G. Johnson Law, PLLC
6688 145th Street West,
Apple Valley, MN 55124
Telephone: (952) 930-2485
greg@gjohnsonlegal.com

Telephone:  (314) 226-1015
mflannery@cuneolaw.com

Thomas P. Thrash
Thrash Law Firm, P.A.
1101 Garland Street
Little Rock, AR 72201
Telephone: (501) 374-1058
tomthrash@sbcglobal.net

Charles Barrett
Charles Barrett, P.C.
6518 Highway 100
Suite 210
Nashville, Tennessee 37205
Telephone: (615) 515-3393
charles@cfbfirm.com

*Attorneys for Dealership Plaintiffs*